FILED
November 24, 2015
Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-15-00248-CV
7922603
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/20/2015 11:03:34 AM
JEFFREY D. KYLE
CLERK

**No. 03-15-000248-CV**

IN THE THIRD COURT OF APPEALS
THIRD JUDICIAL DISTRICT OF TEXAS
AUSTIN, TEXAS

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/20/2015 11:03:34 AM
JEFFREY D. KYLE
Clerk

BRIGHAM EXPLORATION COMPANY, BEN M. BRIGHAM,
DAVID T. BRIGHAM, HAROLD D. CARTER, STEPHEN C. HURLEY,
STEPHEN P. REYNOLDS, HOBART A. SMITH, SCOTT W. TINKER,
STATOIL ASA, AND FARGO ACQUISITION, INC.,

*Appellants*,

vs.

RAYMOND BOYTIM, et al., INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Appellees*.

Appeal from the 261st Judicial District Court of Travis County, Texas
Trial Court No. D-1-GN-11-003205
The Honorable Lora Livingston, Presiding

**PLAINTIFFS-APPELLEES' OMNIBUS ANSWERING BRIEF
TO OPENING BRIEFS OF APPELLANTS BRIGHAM,
STATOIL ASA AND FARGO ACQUISITION, INC.**

MICHAEL D. MARIN
State Bar No. 00791174
BOULETTE GOLDEN & MARIN L.L.P.
2801 Via Fortuna Drive, Suite 530
Austin, TX 78746
Telephone: 512/732-8900
512/732-8905 (fax)
mmarin@boulettegolden.com
*Liaison Counsel*

*Oral Argument Requested*

RANDALL J. BARON
DAVID T. WISSBROECKER
STEVEN M. JODLOWSKI
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

SAMUEL H. RUDMAN
MARK S. REICH
MICHAEL G. CAPECI
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Class Counsel for Appellees*

KENDALL LAW GROUP, LLP
JOE KENDALL
DANIEL HILL
JAMIE J. McKEY
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: 214/744-3000
214/744-3015 (fax)

THE BRISCOE LAW FIRM, PLLC
WILLIE C. BRISCOE
8150 N. Central Expressway, Suite 1575
Dallas, TX 75206
Telephone: 214/239-4568
281/254-7789 (fax)

DUNNAM & DUNNAM LLP
HAMILTON LINDLEY
4125 West Waco Drive (76710)
P.O. Box 8418
Waco, TX 76714-8418
Telephone: 254/753-6437
254/753-7434 (fax)

BRODSKY & SMITH, LLC
EVAN J. SMITH
MARC ACKERMAN
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
Telephone: 610/667-6200
610/667-9029 (fax)

LEVI & KORSINSKY, LLP
SHANE T. ROWLEY
30 Broad Street, 24th Floor
New York, NY 10004
Telephone: 212/363-7500
866/367-6510 (fax)

KOHN, SWIFT & GRAF, P.C.
DENIS F. SHEILS
One South Broad Street, Suite 2100
Philadelphia, PA 19107-3389
Telephone: 215/238-1700
215/238-1968 (fax)

THE WEISER LAW FIRM, P.C.
PATRICIA C. WEISER
JAMES M. FICARO
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: 610/225-2677
610/408-8062 (fax)

RYAN & MANISKAS, LLP
KATHARINE M. RYAN
RICHARD A. MANISKAS
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Telephone: 484/588-5516
484/450-2582 (fax)

KELLY N. REDDELL
THE REDDELL FIRM PLLC
100 Highland Park Village, Suite 200
Dallas, Texas 75205
Telephone: 214/295-3031

*Additional Counsel for Appellees*

**TABLE OF CONTENTS**

**Page**

INDEX OF AUTHORITIES ............................................................... v

RECORD REFERENCES ................................................................ xiii

COUNTER-STATEMENT OF THE CASE ................................................. xiv

STATEMENT REGARDING ORAL ARGUMENT ......................................... xvi

COUNTER-STATEMENT OF THE ISSUES ........................................... xvii

COUNTER-STATEMENT OF THE FACTS ................................................... 1

    I.    Background of the Acquisition ....................................... 1

    II.   Management and Jefferies Urge the Board to Sell the Company ................................................................ 1

    III.  The Management-Driven Sales Process ..................................... 2

    IV.  After Reporting Record Production, the Board Agrees to a Tender Offer ....................................................... 5

    V.   The Acquisition ...................................................... 7

    VI.  Self-Dealing ........................................................ 7

STATEMENT OF PROCEDURAL HISTORY ............................................. 9

    I.    Plaintiffs Seek Injunctive Relief on an Expedited Basis ............................................................... 9

    II.   The Cash-Out Merger Is Consummated and Plaintiffs Amend Their Petition to Seek Damages ................................. 10

    III.  The First Round of Class Certification Proceedings ............... 11

A. Plaintiffs Move for Class Certification............................ 11

B. The Evidentiary Hearing on Plaintiffs' Motion............. 12

C. After Conducting Further Proceedings, the Trial
Court Grants Plaintiffs' Motion..................................... 14

D. The First Appeal ............................................................ 14

IV. The Second Round of Class Certification Proceedings ........... 15

A. Plaintiffs Submit an Amended Trial Plan and
Again Move for Class Certification................................ 15

B. The Trial Court Grants Plaintiffs' Renewed
Motion.............................................................................. 16

SUMMARY OF THE ARGUMENT ............................................................ 18

ARGUMENT............................................................................................. 23

I. This Court Reviews a Grant of Class Certification for
Abuse of Discretion................................................................... 23

II. The Class Definition Is Appropriate ........................................ 23

III. The Trial Plan Adopted by the Trial Court Complies
with *Brigham I* and *Bernal*........................................................ 30

A. The Trial Plan Properly Analyzes Plaintiffs'
Claims .............................................................................. 31

1. The Trial Plan Properly Analyzes How
Damages Will Be Proven ..................................... 31

2. Plaintiffs Offer One Damages Theory ................ 33

3. The Trial Plan Properly Explains Plaintiffs' Breach of Fiduciary Duty Claims .................................................... 34

4. The Trial Court Properly Understood and Explained the Role of Plaintiffs' Claims Based Upon Defendants' Non-Disclosures .......................................... 37

5. The Trial Plan Properly Analyzes Plaintiffs' Aiding-and-Abetting Claims Against Statoil ...................................... 39

B. The Trial Plan Properly Analyzes Defendants' Pleaded Defenses .......................................... 42

1. The Court Fully Understood and Gave Due Consideration to the Effect of Defendants' Alleged Defenses of Acquiescence, Ratification, Estoppel, and Waiver.......................................... 43

a. Delaware Has Repeatedly Found These Defenses Inapplicable to Plaintiffs' Claims .................................. 43

b. Even if They Applied, Defendants' Pleaded Defenses Do Not Preclude Class Certification.................................. 46

c. Defendants Cannot Overcome the Reality that These Types of Cases Are Routinely Certified and Tried on a Class-Wide Basis.............................. 50

2. The Court Properly Analyzed Defendants' "Proportionate Responsibility" Defense .................................. 51

IV.  Plaintiffs Satisfied the Requirements for Class
     Certification.................................................................... 54

     A.  The Trial Court Acted Within Its Discretion in
         Finding that Plaintiffs' Claims Are Typical ................. 55

     B.  The Trial Court Acted Within Its Discretion in
         Finding that Common Issues Predominate.................... 58

     C.  The Trial Court's Numerosity Finding Was
         Sufficiently Supported .................................................. 58

     D.  The Trial Court Acted Within Its Discretion in
         Finding that Plaintiffs Will Fairly and
         Adequately Protect the Interests of the Class ............... 61

         1.  Adequacy Findings Are Entitled to
             Substantial Deference........................................... 63

         2.  Statoil Concedes that Adequacy Is Met
             by Not Challenging the Vast Majority of
             the Factors Relevant to the Adequacy
             Determination ....................................................... 64

         3.  The Trial Court's Findings Regarding
             Plaintiffs' Familiarity with the Litigation
             Are Amply Supported by the Record.................. 66

             a.  Howard Weissberg.................................... 68

             b.  Walter Schwimmer................................... 72

             c.  Jeffery Whalen ......................................... 77

             d.  Robert Fioravanti ..................................... 79

             e.  Raymond Boytim ...................................... 82

f.    Myrna Goodman ........................................ 84

g.    Hugh Duncan .............................................. 85

CONCLUSION ................................................................................ 88

CERTIFICATE OF COMPLIANCE ............................................... 91

CERTIFICATE OF SERVICE ......................................................... 91

APPENDIX

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Adams v. Reagan*,
791 S.W.2d 284 (Tex. App.–Fort Worth 1990, no writ)..............................65, 76

*Andra v. Blount*,
772 A.2d 183 (Del. Ch. 2000) ....................................................................57

*Bershad v. Curtiss-Wright Corp.*,
535 A.2d 840 (Del. 1987)......................................................27, 28, 29, 49

*BMG Direct Marketing, Inc. v. Peake*,
178 S.W.3d 763 (Tex. 2005) ....................................................................43

*Brevan Howard Credit Catalyst Master Fund Ltd. v.*
*Spanish Broad. Sys. Inc.*,
No. 9209-VCG, 2015 Del. Ch. LEXIS 141
(Del. Ch. May 19, 2015)....................................................................48

*Brigham Exploration Co. v. Boytim*,
No. 03-13-00191-CV, 2014 Tex. App. LEXIS 9068
(Tex. App.-Austin Aug. 15, 2014, no pet.)....................................................*passim*

*Bundesen v. Beck*,
No. 11,347, 1992 Del. Ch. LEXIS 42
(Del. Ch. Feb. 12, 1992) ....................................................................48

*Canyon Lake Island Prop. Owners Ass'n v. Sterling/Suggs L.P.*,
No. 03-14-00208-CV, 2015 Tex. App. LEXIS 5739
(Tex. App.–Austin June 5, 2015, no pet. h.) ....................................................65

*Chen v. Howard-Anderson*,
87 A.3d 648 (Del. Ch. 2014) ....................................................................37

*Chevron U.S.A., Inc. v. Kennedy*,
808 S.W.2d 159 (Tex. App.-El Paso 1991, writ dism'd w.o.j.) ........................60

*Cinerama, Inc. v. Technicolor, Inc.*,
663 A.2d 1156 (Del. 1995)........................................................36

*Clements v. Rogers*,
790 A.2d 1222 (Del. Ch. 2001) ................................................57

*Cooper v. Ross & Roberts, Inc.*,
505 A.2d 1305 (Del. Ch. 1986) ................................................52

*Corwin v. KKR Fin. Holding, LLC*,
No. 629, 2015 Del. LEXIS 473
(Del. Oct. 2, 2015) ...................................................................47

*Crescent/Mach I Partners, L.P. v. Turner*,
No. 17455, 2000 Del. Ch. LEXIS 145
(Del. Ch. Sept. 29, 2000) .........................................................38

*DaimlerChrysler Corp. v. Inman*,
252 S.W.3d 299 (Tex. 2008) ..............................................35, 41

*Dale v. Town of Elsmere*,
No. 99M-01-15-VAB, 2001 Del. Super. LEXIS 161
(Del. Super. Ct. Apr. 27, 2001) ...............................................26

*Dieter v. Prime Computer, Inc.*,
681 A.2d 1068 (Del. Ch. 1996) ..........................................24, 31

*Farmers Ins. Exch. v. Leonard*,
125 S.W.3d 55 (Tex. App.–Austin 2003, no pet.)................*passim*

*Forsyth v. Lake LBJ Inv. Corp.*,
903 S.W.2d 146 (Tex. App.–Austin 1995, writ dism'd w.o.j.)..................*passim*

*Frank v. Wilson & Co.*,
32 A.2d 277 (Del. 1943) ...........................................................47

*Gantler v. Stephens*,
965 A.2d 695 (Del. 2009)......................................................44, 47

*Garcia v. Walker*,
No. 04-05-00343-CV, 2006 Tex. App. LEXIS 1409
(Tex. App.–San Antonio Feb. 22, 2006, no pet.) ..........................................63, 72

*Gesoff v. IIC Indus.*,
902 A.2d 1130 (Del. Ch. 2006) ....................................................................27

*Harris Constr. Co. v. GGP-Bridgeland, LP*,
No. H-07-3468, 2009 U.S. Dist. LEXIS 69476
(S.D. Tex. Aug. 10, 2009) .............................................................................52

*Henry Schein Inc. v. Stromboe*,
102 S.W.3d 675 (Tex. 2002) ........................................................................64

*Hi-Lo Auto Supply L.P. v. Beresky*,
986 S.W.2d 382 (Tex. App.–Beaumont 1999, writ mand. denied)....................66

*In re Beatrice Cos., Inc. Litig.*,
No. 155, 1987 Del. LEXIS 1036
(Del. Ch. Feb. 20, 1987) ..............................................................................24

*In re Celera Corp. S'holder Litig.*,
59 A.3d 418 (Del. 2012)......................................................................*passim*

*In re Celera Corp. S'holder Litig.*,
No. 6304-CVP, 2012 Del. Ch. LEXIS 66
(Del. Ch. Mar. 23, 2012) ....................................................................*passim*

*In re Countrywide Corp. S'holders Litig.*,
No. 3464-VCN, 2009 Del. Ch. LEXIS 44
(Del. Ch. March 31, 2009)............................................................................26

*In re Dole Food Co., Inc. S'holder Litig.*,
No. 8703-VCL, 2015 Del. Ch. LEXIS 223
(Del. Ch. Aug. 27, 2015) ....................................................................*passim*

*In re Gaylord Container Corp. S'holders Litig.*,
747 A.2d 71 (Del. Ch. 1999) ........................................................................54

*In re JCC Holding Co. S'holder Litig.*,
843 A.2d 713 (Del. Ch. 2003) ...............................................................19

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014)...........................................................68

*In re PNB Hldg. Co. S'holders Litig.*,
No. 28-N, 2006 Del. Ch. LEXIS 158
(Del. Ch. Aug. 18, 2006) .......................................................................32

*In re Prodigy Commc'ns Corp. S'holders Litig.*,
No. 19113, 2002 Del. Ch. LEXIS 95
(Del. Ch. July 26, 2002) ...................................................................24, 27

*In re Rural Metro Corp. S'holders Litig.*,
88 A.3d 54 (Del. Ch. 2014) .............................................................*passim*

*In re Rural/Metro Corp. Stockholders Litig.*,
102 A.3d 205 (Del. 2014) ......................................................................38

*In re Transkaryotic Therapies, Inc.*,
954 A.2d 346 (Del. 2008).......................................................................27

*In re Triarc Cos., Inc. Class & Deriv. Litig.*,
791 A.2d 872 (Del. Ch. 2001) ..........................................................24, 25

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
919 A.2d 563 (Del. Ch. 2007) ................................................................38

*Intratex Gas Co. v. Beeson*,
22 S.W.3d 398 (Tex. 2000) .....................................................................23

*Joseph v. Shell Oil Co.*,
No. 7450, 1985 Del. Ch. LEXIS 458
(Del. Ch. Feb. 8, 1985) ..........................................................................33

*King v. City of Austin*,
No. 03-03-00173-CV, 2004 Tex. App. LEXIS 2623
(Tex. App.–Austin Mar. 25, 2004, no pet.) ......................................67, 86

*Klaassen v. Allegro Dev. Corp.*,
106 A.3d 1035 (Del. 2014)...............................................................................47

*Louisiana-Pacific Corp. v. Andrade*,
19 S.W.3d 245 (Tex. 1999) ..............................................................................49

*Malone v. Brincat*,
722 A.2d 5 (Del. 1998) ....................................................................................38

*Methodist Hosps. of Dallas v. Tall*,
972 S.W.2d 894 (Tex. App.–Corpus Christi 1998, no pet.).............................59

*Mills Acquisition Co. v. MacMillan, Inc.*,
559 A.2d 1261 (Del. 1989)..........................................................................36, 37

*Nevins v. Bryan*,
885 A.2d 233 (Del. Ch. 2005) ..........................................................................49

*Norberg v. Security Storage Co. of Wash.*,
No. 12885, 2000 Del. Ch. LEXIS 142
(Del. Ch. Sept. 19, 2000) .....................................................................28, 29, 49

*Omnicare, Inc. v. NCS Healthcare, Inc.*,
809 A.2d 1163 (Del. Ch. 2002) ........................................................................26

*Pate v. Elloway*,
No. 01-03-00187-CV, 2003 Tex. App. LEXIS 9681
(Tex. App.–Houston [1st Dist.] Nov. 13, 20013, pet. denied) .........27, 66, 67, 75

*Pate v. Havens*,
No. 04-0006, 2004 Tex. LEXIS 1160
(Tex. Nov. 5, 2004).....................................................................................20, 51

*Pate v. Havens*,
No. 04-0006, 2005 Tex. LEXIS 305
(Tex. Apr. 8, 2005) ..........................................................................20, 27, 50, 51

*Rabkin v. Philip A. Hunt Chem. Corp.*,
498 A.2d 1099 (Del. 1985)...............................................................................58

*Rainbow Group, Ltd. v. Johnson,*
  990 S.W.2d 351 (Tex. App.–Austin 1999, pet dism'd w.o.j.) ...........................60

*Ret. Sys. v. Boeing Co.,*
  711 F.3d 754 (7th Cir. 2013) ..................................................................87

*Schultz v. Ginsburg,*
  965 A.2d 661 (Del. 2009) .....................................................................25

*Shapiro v. Pabst Brewing Co.,*
  No. 7339, 1985 Del. Ch. LEXIS 496
  (Del. Ch. July 30, 1985) ....................................................................57, 58

*Snyder Commc'ns v. Magana,*
  94 S.W.3d 213 (Tex. App.–Corpus Christi 2002, pet. filed) ............................59

*Southwestern Ref. Co. v. Bernal,*
  22 S.W.3d 425 (Tex. 2000) .........................................................*passim*

*Steinhardt v. Howard-Anderson,*
  No. 5878-VCL, 2012 Del. Ch. LEXIS 1
  (Del. Ch. Jan. 6, 2012) ....................................................................28, 29

*Stewart v. Wilmington Tr. SP Servs.,*
  112 A.3d 271 (Del. Ch. 2015) .............................................................71

*Texas Workers' Comp. Ins. Facility v. Personnel Servs.,*
  895 S.W.2d 889 (Tex. App.–Austin, 1995, no writ) ......................................49

*Turner v. Bernstein,*
  768 A.2d 24 (Del. Ch. 2000) ................................................................56

*Weatherly v. Deloitte & Touche,*
  905 S.W.2d 642 (Tex. App.–Houston [14th Dist.] 1995,
  writ dism'd w.o.j.) ............................................................................76

*Women's Clinic of S. Tex. v. Alonzo,*
  No. 13-12-00537, 2013 Tex. App. LEXIS 7263
  (Tex. App.–Corpus Christi June 13, 2013, pet. denied)....................................59

*Yucaipa Am. Alliance Fund II, L.P. v. Riggio,*
  1 A.3d 310 (Del. Ch. 2010) ...............................................................53

**STATUTES, RULES AND REGULATIONS**

Tex. Civ. Prac. & Rem. Code Ann.
  §33.002(a)(1) ............................................................................51, 52
  §33.003 ...........................................................................................53
  §33.003(b) .......................................................................................53

Tex. R. App. P.
  Rule 25.1 ........................................................................................14
  Rule 38.1(e) ....................................................................................55

Texas Rules of Civil Procedure
  Rule 42................................................................................*passim*
  Rule 42(a) .......................................................................................55
  Rule 42(b) .......................................................................................55
  Rule 42(c) .......................................................................................31

Texas Business Corporation Act
  Article 8.02 .....................................................................................52

8 Del. C.
  §102(b)(7) .................................................................34, 35, 36, 37
  §253 ...............................................................................................44
  §327 ...............................................................................................26

## RECORD REFERENCES

| | |
|---|---|
| Brigham AB ___ | Brief of Brigham Appellants (September 28, 2015) |
| Statoil AB ___ | Brief of Appellants Statoil ASA and Fargo Acquisition, Inc. (September 28, 2015) |
| CR ___ | Clerk's Record Volume 1 of 1 (June 4, 2015) |
| 1SCR ___ | Supplemental Clerk's Record Volume 1 of 1 (June 5, 2015) |
| 2SCR ___ | Supplemental Clerk's Record Volume 1 of 1 (June 12, 2015) |
| 3SCR___ | Supplemental Clerk's Volume III (August 12, 2015) |
| SCR Ex. 1___ | Exhibit 1 to Supplemental Clerk's Record (August 14, 2015) |
| RR (Vol. 1)___ | Reporter's Record Volume 1 of 4 (July 9, 2015) |
| RR (Vol. 2) ___ | Reporter's Record Volume 2 of 4 (July 9, 2015) |
| RR (Vol. 3) ___ | Reporter's Record Volume 3 of 4 (July 9, 2015) |
| RR (Vol. 4) ___ | Reporter's Record Volume 4 of 4 (July 9, 2015) |

## COUNTER-STATEMENT OF THE CASE

Consistent with Tex. R. App. P. 38.1(d), Plaintiffs-Appellees offer this simple statement of the case.

This case concerns the sale of Brigham Exploration Company ("Brigham" or the "Company"), a Delaware corporation headquartered in Texas, to Statoil ASA ("Statoil"), a Norwegian multinational oil and gas company, via a cash tender offer of $36.50 per share. Plaintiffs, who collectively owned 37,025 shares of Brigham when the deal was announced (and over 20,000 shares when the deal closed), allege that the now-former members of Brigham's Board of Directors breached their fiduciary duties under Delaware law in agreeing to and effecting the cash-out merger. Plaintiffs also allege that Brigham and Statoil aided and abetted the Board's breach of fiduciary duties in connection with the buyout. CR 5. Plaintiffs seek damages for the class as a result of defendants' breaches of fiduciary duty. CR 8.

This is the second interlocutory appeal stemming from three-year long class certification proceedings before the trial and appellate courts. The instant appeal pertains to the trial court's April 9, 2015 order, in which it certified plaintiffs' claims for class treatment under Tex. R. Civ. P. 42. CR 3163-67. The trial court entered an order certifying a class of "all holders of common

stock of Brigham Exploration Company as of October 17, 2011" and adopted

an amended trial plan, dated March 19, 2015.  *Id*.; Brigham AB, Appendix B.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees welcome oral argument to assist the Court in resolving the issues presented.

## COUNTER-STATEMENT OF THE ISSUES

Did the trial court, with the benefit of thousands of pages of evidentiary submissions and numerous rounds of briefing from the parties, two hearings to specifically address Appellants' pleaded defenses, and numerous successful class-wide trials in cases involving the same claims and defenses asserted here, conduct a rigorous analysis of Appellants' pleaded defenses for purposes of class certification?

## COUNTER-STATEMENT OF THE FACTS

### I.   Background of the Acquisition

Brigham engages in the exploration, development and production of oil and natural gas in the United States.  CR 9.

In the decade leading up to the sale, the Company had invested heavily in its exploration activities, particularly in the Williston Basin, a region that has the largest onshore oil accumulations in the United States.  CR 9, 16.  As a result of that investment, the Company had steadily seen its revenues grow.  In 2004, the Company reported revenue of $71.7 million.  By 2007, the Company's revenue had nearly doubled – to $124.7 million.  *Id.*

In 2008, the Company essentially struck gold, discovering several significant oil reserves in the Vicksburg and Williston Basin.  CR 16-17.  Within the next year, the Company announced several more discoveries, including a deep Frio field discovery and three high rate discoveries in the Bakken. *Id.*

### II.   Management and Jefferies Urge the Board to Sell the Company

As Brigham's production was soaring, shareholders were positioned to reap the long-term benefits of the Company's oil discoveries.  CR 17.  Management, however, had a different idea. *Id.*  In late 2010, Ben Brigham, the

- 1 -

Company's President and CEO, and his management team began formulating a plan to sell the Company so that they could cash out tens of millions of dollars of options and other equity holdings, at the expense of shareholders. *Id.*

Unbeknownst to the Board, management quietly began working with the Board's long-time financial advisor, Jefferies & Company, Inc. ("Jefferies"), in an effort to convince the Board that they should sell the Company rather than continuing to execute on the current business plan. CR 17. On December 10, 2010, Jefferies appeared at a Board meeting to pitch a potential sale of the Company. CR 17-18. Sensing an opportunity for a big payday, Jefferies predictably called the conditions for a sale "favorable" and predicted that buyer interest would be "strong." Conveniently, Jefferies had already identified two lists of companies for the Board to potentially approach. At the conclusion of the meeting, the Board authorized Jefferies to contact only 10 of the suggested 16 companies on the lists. The Board also retained Jefferies, without inquiring into whether Jefferies had any conflicts of interest (it did) that would make its advice less reliable. *Id.*

## III.  The Management-Driven Sales Process

Even though the Board was considering a potential sale, the Board decided to allow a conflicted management team and conflicted bankers, rather than an independent special committee, to meet and negotiate with potential

buyers, including Statoil. CR 18-19. Over the next two months, Jefferies began contacting potential buyers. *Id.*

These efforts, however, were not as fruitful as management and Jefferies had predicted. CR 21. At a Board meeting on March 11, 2011, Jefferies informed the Board that for various reasons each of the limited number of companies contacted had declined to move forward. CR 20. However, rather than end the process and continue to execute on its standalone business plan, the Board decided to single-track discussions with Statoil even though Statoil had yet to even indicate a price at which it was willing to make an offer and had already told Brigham that it was not willing to provide an offer that included a premium to Brigham's stock price. CR 21-22. By April 2011, the Company's talks with Statoil had slowed to a crawl, which frustrated Brigham's upper management. CR 21-23.

Meanwhile, the Company continued to report spectacular financial results. CR 20-21. On February 24, 2011, the Company reported record production volumes, revenues and operating income for the fourth quarter of 2010. *Id.*

This news led to a slew of upward revisions by analysts between February 2011 and June 2011. CR 20. Among the analysts who believed the Company's share price would reach $45.00 in the near term was the Board's

own advisor, Jefferies, which, on June 1, 2011, issued a report in which it set the price target on the Company at $45.00. CR 6, 21. Notably, three months later, Jefferies offered an opinion to Brigham shareholders in which it stated that the $36.50 per share in consideration offered by Statoil was "fair," despite being $8.50 less than the price target Jefferies' analysts had set for the Company just months earlier. *Id.*

Internally, Company management continued to refine valuation models under various rig programs, as directed by the Board, to account for the Company's newfound discoveries and substantially improved outlook. CR 22-23. On March 23, 2011, the Board held a meeting at which Eugene Shepherd, Brigham's then-Chief Financial Officer, provided a presentation to the Board concerning the net asset value and profitability of the Company under 12-, 16-, 20-, and 24-rig programs. *Id.*

The Board had also asked Jefferies to develop valuation models based on these rig programs. Jefferies had developed a valuation model under a more conservative program, which assumed that the Company would increase to 16 operated rigs by the end of 2012 and then stay constant, and an accelerated model, which assumed that the Company would increase to 30 operated rigs by the end of 2013. CR 22-23. Ben Brigham and his management team, as well as Jefferies, believed the 30-rig initiative was achievable. CR 29. Under

- 4 -

Jefferies' analysis, the accelerated, or 30-rig model, implied a net asset value per share of between $79.82 and $149.94, depending on the price of oil. CR 23. Defendants did not disclose Jefferies' 30-rig analysis to shareholders. *Id.* Nor did defendants disclose or provide any information whatsoever concerning several other accelerated drilling programs developed by the Company. CR 22.

## IV. After Again Reporting Record Production, the Board Agrees to a Tender Offer

On August 8, 2011, the Company reported that its average daily production volumes for the second quarter of 2011 were a quarterly record of 12,206 barrels of crude oil equivalent per day, up 57% from the second quarter of 2010. CR 24. Despite record financial results, the Board continued to allow management to push for a sale. *Id.* In early September 2011, management re-approached Statoil, which had gone silent several months earlier. CR 23-24.

The Board did not direct Jefferies to contact other potential buyers, or to return to the ten potential buyers contacted in January, even though Brigham's recent successes and newfound oil reserves had made it a more attractive sales target. CR 24-25. Indeed, on September 28, 2011, Chevron Corp., which had been contacted in January but initially said it was not interested, contacted Jefferies to express interest in pursuing a deal with Brigham. Chevron

requested access to the data room so that it could perform due diligence and possibly put together a bid. CR 25. Out of fear that it would upset Statoil, the Board instructed Jefferies not to give Chevron access to the data room. *Id.*

Then, in early October, after an eight-month period when virtually no material terms were discussed by Brigham and Statoil, including price, the terms of a $4 billion buyout with Statoil were negotiated in mere days. CR 25-27. To get that deal, however, Ben Brigham deceived his fellow Board members. CR 380-81. In the days leading up to the execution of the Merger Agreement, Ben Brigham's eagerness to sell the Company led him to secretly make a "handshake deal" with Statoil without seeking Board approval for the price of $36.50. *Id.* Realizing what he had done, Ben Brigham tried to backtrack on his "handshake," but then agreed to secure Board approval for the price rather than unwind the deal and maybe lose the offer from Statoil. *Id.* Notably, the walking orders Ben Brigham had been given at the time by the Board were to hold firm at $40. *Id.*

None of this was disclosed to the Board. CR 381. On the morning of October 17, 2011, the Company and Statoil executed the Merger Agreement, and the Company and Statoil issued a press release announcing the tender offer. CR 27-28. By structuring the transaction as a tender offer, the Board essentially eliminated its ability to shop the Company. CR 37.

## V. The Acquisition

On October 28, 2011, Statoil launched the tender offer, which was set to expire one month later. CR 28. That same day, Ben Brigham sent a letter to shareholders, informing them that Statoil had commenced a tender offer and urging them to tender their shares. *Id.* However, during the initial tender offer period, Statoil failed to get enough tendered shares to close the deal and complete the acquisition. CR 28. Statoil therefore commenced a subsequent offering period beginning on December 1, 2011 and expiring on December 7, 2011. *Id.* During the subsequent offering period, Statoil exercised its option, under the Merger Agreement, to purchase newly-issued shares from the Company so that Statoil would own enough shares to satisfy the short-form threshold. *Id.*

Statoil closed the transaction on December 8, 2011. CR 29.

## VI. Self-Dealing

When the deal closed, Brigham's management team made off with nearly $100 million in merger related compensation. CR 34-36. In fact, one month before the acquisition was announced, and while the Company was seeking a buyer, defendant directors and certain Company executives granted themselves what were essentially spring-loaded options by amending their existing equity incentive package to provide for accelerated vesting of their outstanding

- 7 -

options and restricted shares so that they could cash out in a merger with Statoil. *Id.* Defendants also provided rich golden parachutes to the rest of the management team to assure everyone at the Company was incentivized to push for a deal with Statoil. *Id.*

## STATEMENT OF PROCEDURAL HISTORY

Although this action arrives at this Court before a final resolution in the trial court, it has already generated a substantial record. The class certification order subject to the instant appeal is the result of an extensive, multi-year class certification process before the trial court and this Court of Appeal. A summary of those proceedings is set forth below.

## I. Plaintiffs Seek Injunctive Relief on an Expedited Basis

On October 17, 2011, one day after signing the merger agreement, Brigham and Statoil jointly announced that they had entered into a merger agreement, pursuant to which Statoil would acquire Brigham. CR 27. Following the announcement, five shareholder class actions were filed against Brigham, its Board and Statoil. CR 291-97. These lawsuits sought to enjoin the acquisition. CR 221.

Statoil launched the tender offer on October 28, 2011 and announced that the tender offer would expire one month later, on November 30, 2011. CR 28. Plaintiffs took limited, expedited discovery, and promptly moved for temporary injunctive relief, seeking to delay the close of Statoil's tender offer until defendants disclosed one piece of information: a 30-rig valuation analysis prepared by Brigham's financial advisor, Jefferies, and presented to the Brigham Board prior to the execution of the merger agreement. CR 29, 305.

Plaintiffs were unsuccessful in attempting to enjoin the tender offer based upon this single non-disclosure, and on December 8, 2011, the deal closed. CR 29, 305.

## II. The Cash-Out Merger Is Consummated and Plaintiffs Amend Their Petition to Seek Damages

Once the merger was consummated, plaintiffs consolidated the various actions and amended their petition to seek damages. CR 4-48. In March 2012, plaintiffs filed a consolidated amended petition for breach of fiduciary duty. *Id.* Plaintiffs allege that the officers and directors of Brigham had breached their fiduciary duties of loyalty, good faith and fair dealing, independence, and due care in connection with the consummation of the merger by, among other things:

(i) engaging in self-dealing by obtaining tens of millions of dollars in personal benefits for themselves;

(ii) making no effort to ensure that the interests of the public shareholders were adequately protected during the sales process (by, for example, establishing a special committee of independent directors to oversee the process); and

(iii) selling the Company at a significantly undervalued price.

CR 44-45.

Plaintiffs' consolidated petition also alleges that the directors failed to disclose certain material information to Brigham shareholders concerning the

sales process leading to the merger, the Company's relationship with its financial advisors, who were concurrently retained, as well as the impact that those relationships had on the process, and the data and input underlying the fairness opinion of the financial advisors as well as the methodologies employed. CR 41-44. The petition also alleges that Brigham and Statoil aided and abetted the breaches. CR 5.

## III. The First Round of Class Certification Proceedings

### A. Plaintiffs Move for Class Certification

Plaintiffs first moved for class certification in 2012. CR 678-983. In the motion, plaintiffs sought to certify a class of "[a]ll holders of Brigham common stock as of October 17, 2011" – the date the transaction was announced. CR 683.

As support for their motion, plaintiffs submitted, *inter alia*, deposition testimony from the former officers and executives of Brigham. CR 708-09, 758-64. Plaintiffs also submitted sworn affidavits from each of the seven proposed class representatives. CR 656-76. In the affidavits, the class representatives confirmed, under oath, that they: (i) owned Brigham stock at the time the merger was announced; (ii) believed that the price accepted by the Brigham Board and offered by Statoil undervalued their holdings; (iii) understood that the role of a class representative was to act as a fiduciary

- 11 -

for the class; (iv) were familiar with the litigation through the review of pleadings and other legal papers; (v) had kept abreast of the progress of the litigation through discussions with their counsel; and (vi) were willing to attend trial. *Id.* Plaintiffs also submitted resumes from the law firms seeking to be appointed as class counsel. CR 850-944.

Defendants opposed plaintiffs' motion for class certification, arguing that plaintiffs and their counsel were inadequate, that individual issues predominated, that the claims of plaintiffs were atypical, and that plaintiffs' proposed trial plan was deficient. CR 1862.

Prior to filing its opposition, defendants deposed all of the named plaintiffs. 3SCR 96-451. Collectively, the plaintiffs testified for nearly 30 hours. *Id.* The transcripts of these depositions cover 1,078 pages. *Id.*

### B. The Evidentiary Hearing on Plaintiffs' Motion

On October 22, 2012, the trial court held an all-day hearing on plaintiffs' motion for class certification. The hearing began with counsel for the parties providing opening statements in support of their position on plaintiffs' motion. CR 1589, 1617-27.

Then, for nearly the rest of the day, four of the seven class representatives, all of whom had traveled from various locations across the United States to attend the hearing, provided live testimony about a variety of

topics relating to their adequacy as class representatives, including their motivation for bringing the lawsuit; familiarity with the claims asserted in the action; their role in overseeing and working with their counsel; familiarity with the factual record in this case; and ability and willingness to fulfill their role as class representative should the court certify the class. CR 1627-1785. Counsel for defendants spent hours cross-examining the proposed class representatives. CR 1647-80, 1698-1713, 1731-51, 1765-84.

After Messrs. Weissberg, Schwimmer, Whalen and Fioravanti completed their testimony, counsel for the parties gave lengthy closing arguments in support of their respective positions. CR 1591, 1794-1858. Those presentations addressed the numerous legal and factual arguments made in support of, and in response to, plaintiffs' motion for class certification. *Id.* In particular, the parties addressed defendants' challenges to plaintiffs' showing on the adequacy and typicality requirements. CR 1796-1845. In all, 11 exhibits were admitted into the record during the hearing. CR 1591.

At the end of the hearing, the trial court took plaintiffs' motion for class certification under submission pending the submission of a reply brief from plaintiffs' counsel, along with a number of additional evidentiary items from the parties. CR 1788-93. Among the evidentiary submissions was a compact disc, compiled by defendants, containing one-hour worth of videotaped

excerpts from the depositions of the proposed class representatives which defendants believed supported their position that the named plaintiffs were inadequate. *Id.* At the trial court's request, the parties also lodged ***complete*** copies of the deposition transcripts of the named plaintiffs for the court's review. *Id.*

### C. After Conducting Further Proceedings, the Trial Court Grants Plaintiffs' Motion

One-and-a-half months later, on December 18, 2012, the trial court indicated in a letter to the parties that it had "considered the pleadings, the evidence and the arguments of counsel," and that it was granting plaintiffs' motion for class certification. CR 1077. After defendants objected to plaintiffs' proposed class certification order, on February 22, 2013, the trial court held a second hearing on plaintiffs' motion. CR 1079-85; RR 4-14.

One week later, on February 27, 2013, the trial court signed an order granting class certification. CR 1195. Defendants then filed a notice of interlocutory appeal to the class certification order under Tex. R. App. P. 25.1.

### D. The First Appeal

In their first appeal, defendants launched a broad attack on the trial court's class certification order. They argued that the case did not meet the requirements for class certification under Rule 42, that the named plaintiffs

cannot adequately protect the interests of absent class members, that plaintiffs' counsel was inadequate, that the named plaintiffs do not satisfy the typicality requirement, and that individualized issues predominated. In addition, they argued that the trial plan adopted by the trial court was deficient on a number of grounds.

After a hearing, this Court reversed on narrow grounds. It explained that the trial plan must "state the elements of [Appellants' pleaded] defenses" and conduct a rigorous analysis of those defenses. To that end, it directed the trial court to conduct further proceedings regarding plaintiffs' proposed trial plan. *Brigham Exploration Co. v. Boytim*, No. 03-13-00191-CV, 2014 Tex. App. LEXIS 9068, at \*9-\*10 (Tex. App.-Austin Aug. 15, 2014, no pet.) ("*Brigham I*").

## IV. The Second Round of Class Certification Proceedings

### A. Plaintiffs Submit an Amended Trial Plan and Again Move for Class Certification

Consistent with this Court's decision, on remand the trial court held further proceedings on defendants' alleged defenses.

At a December 17, 2014 status conference, the trial court instructed plaintiffs to file an amended trial plan that the court indicated it would "rigorously undertake every effort to evaluate its efficacy." RR (Vol. 2) 5-6.

On January 30, 2015, plaintiffs renewed their motion for class certification and submitted an amended trial plan which stated the elements of each defense asserted by defendants, identified the issues of law and fact arising from those defenses, and analyzed how the defenses could be tried on a class-wide basis. CR 119-39. On March 2, 2015, defendants filed an opposition to plaintiffs' renewed class certification motion and proposed trial plan. Defendants responded by arguing that the trial plan misstated the law and failed to sufficiently address several of their defenses. CR 119-39. Defendants also renewed their challenges to plaintiffs' showing on the commonality, typicality, adequacy and numerosity requirements of Tex. R. Civ. P. 42. *Id.* In addition, defendant Statoil filed a supplemental brief in which it challenged the adequacy of the named plaintiffs as class representatives. 3SCR 2-11. Plaintiffs filed responsive briefs on March 16 and 19, 2015. The trial court entertained oral argument by the parties on March 31, 2015. RR (Vol. 3) 1.

## B. The Trial Court Grants Plaintiffs' Renewed Motion

On April 9, 2015, the Court certified plaintiffs' claims for class treatment. It entered an order certifying a class of "all holders of common stock of Brigham Exploration Company as of October 17, 2011" and adopted plaintiffs' Second Amended Trial Plan. CR 3163-67; Brigham AB, App. B.

Defendants filed an interlocutory appeal from that order on April 27, 2015.  CR 3168.

## SUMMARY OF THE ARGUMENT

This is the second appeal stemming from three years of class certification proceedings before the trial court. In the first appeal, defendants launched a broad attack on the trial court's class certification order and insisted, as they do here, that a class could not be certified in this case. The Court did not credit those arguments, but instead, reversed on the narrow issue of the trial plan's treatment of defendants' pleaded defenses. Sending the case back to the trial court, it identified a single issue for further consideration on class certification: whether the trial plan "state[d] the elements of [Appellants' pleaded] defenses" and conducted a rigorous analysis of those defenses. *Brigham I*, 2014 Tex. App. LEXIS 9068, at *9-*10.

That is exactly what the trial court did. On remand, to supplement its extensive previous work, the trial court held two additional hearings and considered a full round of briefing specifically focused on Appellants' pleaded defenses. Those proceedings resulted in a lengthy, 20-page trial plan, fully half of which is devoted to Appellants' pleaded defenses. That plan identifies each defense and the elements thereof, and explains in detail how the defenses will be tried on a class-wide basis based on governing Delaware law and a number of recent class trials in similar cases.

Unable to seriously challenge the trial court's analysis, defendants stray far beyond this Court's opinion in *Brigham I* with a host of arguments unrelated to the narrow issue presently before the Court. Defendants resort back to the erroneous assertion that a class trial simply cannot be conducted here. In defendants' view, "the problems with the Order and Revised Trial Plan run deeper than a simple failure to include sufficient 'detail' in the trial plan." Brigham AB 12, 17-18. The class, they maintain, is "hopelessly unworkable." Brigham AB 12.

That notion, however, has been fundamentally rejected many times in similar cases certified in Delaware and Texas. Courts have routinely found that cases such as this one should be certified because breach of fiduciary claims arising in the context of a merger transaction (as well as the defenses to those claims) affect all shareholders equally. Courts in Delaware, which supplies the substantive law governing plaintiffs' claims, have put it this way: "[c]ases [challenging the fairness of a corporate merger] are quintessential examples of class actions." *In re JCC Holding Co. S'holder Litig.*, 843 A.2d 713, 722 n.20 (Del. Ch. 2003).[1]

---

[1] All citations and footnotes are omitted and emphasis is added, unless otherwise noted.

These orders, like the class certification order in this case, are not simply based on the theoretical assumption or expectation that the cases can be tried classwide; class treatment has repeatedly been proven workable through actual real-world experience. Numerous class cases like this one have not only been certified, but ***successfully tried to judgment*** on a class-wide basis. In the past two years alone, plaintiffs' counsel here have tried two breach of fiduciary duty cases stemming from completed acquisitions of publicly listed companies on a class-wide basis in Delaware, ***despite the fact that the defendants in those cases asserted the same defenses asserted by defendants in this case***. SCR, Ex. 1 at 17-18 (citing *Dole* and *Rural/Metro*); *see also* RR (Vol. 3) at 34 (citing several additional similar class cases that have been tried). Plaintiffs' counsel has also tried one such class case – post-*Bernal* – in Texas, *Pate v. Havens*, No. 04-0006, 2005 Tex. LEXIS 305 (Tex. Apr. 8, 2005). Notably, the class in *Pate* was first upheld by the Texas Court of Appeals, and then twice (on a petition for review and then on a petition for rehearing) by the Texas Supreme Court after full briefing on the merits. *See id.*; *Pate v. Havens*, No. 04-0006, 2004 Tex. LEXIS 1160 (Tex. Nov. 5, 2004). All of these cases were tried in a matter of days, without the need for proof on individual issues.

If cases involving the ***same*** claims, ***same*** defenses, ***same*** substantive law, and the ***same*** type of merger transactions have been certified and successfully

- 20 -

tried as class actions, why can't that be done here? Tellingly, defendants have *no* answer to this question. Defendants do not even try to reconcile their position with the *Dole* and *Rural/Metro* trials or the other similar cases that have likewise been tried on a class basis.

Rather than grappling with this reality, defendants attempt to create their own. In many instances, defendants advance arguments that are directly contrary to controlling Delaware law. In others, defendants do not cite any authority at all. In still others, they rely on overruled authority. For example, defendants say plaintiffs' class definition is "unworkable" and "invalid," but Delaware courts say just the opposite – that plaintiffs' class definition is not only proper, but "commonplace" and "ordinary." Defendants say their defenses require inquiries into class members' state of mind, but Delaware courts say the opposite – that these defenses do not apply in this type of case and, even if they did, plaintiffs' state of mind is "immaterial." Defendants say damages require an inquiry into the price received by each class member who sold into the market, but, again, Delaware courts say the opposite – damages on a per-share basis are the same for every shareholder and dependent on common, class-wide testimony from an expert on the fair value of the company. These three incorrect assertions, and variations on them, form the core of defendants' appeal.

- 21 -

In short, the trial court's class certification order and trial plan stand on firm legal ground. As is evident from a record that now spans more than 4,500 pages, the trial court reached its decision only after the most rigorous of class certification proceedings. Through those proceedings, the trial court fashioned a trial plan that is grounded in real-world experience. That plan explains how this case will be tried in a timely, manageable way, and it was properly adopted by the trial court. As such, in no way does this case embody the "certify now, worry later" approach of which defendants complain. When the Texas Supreme Court in *Bernal* spoke of "actual, not presumed" conformance with Tex. R. Civ. P. 42, this is exactly the type of case it was talking about. The trial court's order granting certification should be affirmed.

## ARGUMENT

### I.   This Court Reviews a Grant of Class Certification for Abuse of Discretion

Plaintiffs-appellees agree that the standard of review is abuse of discretion. *Southwestern Ref. Co. v. Bernal*, 22 S.W.3d 425, 439 (Tex. 2000). "[T]he trial court is afforded broad discretion in defining the class and determining whether to grant or deny a class certification." *Farmers Ins. Exch. v. Leonard*, 125 S.W.3d 55, 60 (Tex. App.–Austin 2003, no pet.) (citing *Intratex Gas Co. v. Beeson*, 22 S.W.3d 398, 406 (Tex. 2000)).

### II.   The Class Definition Is Appropriate

Defendants lead with a challenge to the definition of the class. The trial court certified a "class of all holders of Brigham common stock as of October 17, 2011" – the date of the announcement of the merger. CR 3163-67.

Defendants argue that this class definition is "unworkable" and "invalid." Brigham AB 18-20. According to defendants, the certified class is overbroad because it includes investors who held Brigham shares, but following the announcement of the deal either (i) sold their shares on the open market, or (ii) tendered their shares to Statoil. *Id.*

This argument is directly at odds with settled Delaware law. "[I]t is commonplace for class certification orders entered by this Court in actions

- 23 -

involving the internal affairs of Delaware corporations to define the relevant class as all persons . . . who owned shares as of a given date, and their transferees, successors and assigns." *In re Triarc Cos., Inc. Class & Deriv. Litig.*, 791 A.2d 872, 878-79 (Del. Ch. 2001).

Defendants ignore their own authority, which states that, in merger litigation, classes are "ordinarily" defined to include "all persons who held shares ***as of the date the transaction was announced***." Brigham AB 20 (citing *In re Prodigy Commc'ns Corp. S'holders Litig.*, No. 19113, 2002 Del. Ch. LEXIS 95, at *12 (Del. Ch. July 26, 2002)); *see In re Celera Corp. S'holder Litig.*, 59 A.3d 418, 426, 430 (Del. 2012) (upholding certification of a class which includes shareholders as of the date of the announcement of the merger). Such a class definition is consistent with the principle in Delaware that any shareholder who owns stock at the time a director breaches his fiduciary duties can assert a claim for damages. To have standing, "the plaintiff must have been a stockholder at the time the terms of the merger were agreed upon because it is the terms of the merger, rather than the technicality of its consummation, which are challenged." *In re Beatrice Cos., Inc. Litig.*, No. 155, 1987 Del. LEXIS 1036, at *7-*8 (Del. Ch. Feb. 20, 1987); *Dieter v. Prime Computer, Inc.*, 681 A.2d 1068, 1072 (Del. Ch. 1996) (stating "[i]t is not the Merger that constitutes

the wrongful act of which Plaintiffs complain; it is the 'fixing of the terms of the transaction'").²

In *Celera*, the Delaware Supreme Court recently confronted and rejected a challenge to the standing of a plaintiff who held shares at the time of the announcement of the merger, but who sold the shares prior to the completion of the merger. *Celera*, 59 A.3d at 426, 430; *In re Celera Corp. S'holder Litig.*, No. 6304-CVP, 2012 Del. Ch. LEXIS 66, at *84-*88 (Del. Ch. Mar. 23, 2012). The *Celera* court found that the plaintiff "has legal standing to represent the class [which included shareholders at the time of the announcement of the merger] because it held Celera stock at the time the merger was approved." 59 A.3d at 431. In so doing, the court drew a distinction between shareholders *who held at the time of the announcement*, who *have* standing, and those who had purchased their shares *after* the proposed merger had been announced, who *do not have* standing. *Id*. at 430.

Similarly, in *Schultz v. Ginsburg*, 965 A.2d 661 (Del. 2009), which was cited with approval by the *Celera* court, the Delaware Supreme Court found that breach of fiduciary duty claims such as those at issue here are personal, and therefore do not transfer to later purchasers. *Id*. at 667-68 & n.12 (noting that

---

² Defendants rely on *Triarc*, but fail to note that the class approved by the court in that case actually included selling shareholders. *Triarc*, 791 A.2d at 879.

this reasoning is in accord with Delaware's strong policy against the purchase of a lawsuit). This principle is well-rooted in Delaware law. *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1170 (Del. Ch. 2002) (the "policy animating 8 Del. C. §327 . . . has been applied to preclude stockholders who later acquire their shares from prosecuting direct claims").

As plaintiffs explained to the trial court, plaintiffs were unable to locate a single case in Delaware – hardly considered a plaintiff-friendly forum – in the last 15 years in which a court has defined or limited a class in the way that defendants say must be done here. None of those courts defined the class by excluding investors who tendered their shares to the buyer. *See* CR 2630-3131 (Compendium of 68 Class Certification Orders). Nor did they define a class based on those that sold after the announcement of the merger.[3] *Celera*, 59 A.3d at 431 (finding that the class representative was typical, even though they

---

[3] Defendants attempt to distinguish some of these orders as settlement classes. Brigham AB 36. However, many of the orders involve litigation classes. *See, e.g.*, CR 2670 (Tab 1), 2709 (Tab 6), 2713 (Tab 7), 2744 (Tab 11), 2748 (Tab 12). In any event, in Delaware, a settlement class receives the same level of scrutiny as a litigation class – *i.e.*, "strict compliance with Rule 23" – to ensure that it satisfies all of the certification requirements. Otherwise, the settlement would violate due process. *In re Countrywide Corp. S'holders Litig.*, No. 3464-VCN, 2009 Del. Ch. LEXIS 44, at *37-*38 (Del. Ch. March 31, 2009). Further, like Texas, Delaware adheres to the rule that "'[e]ach class member must have standing to bring the suit in his own right.'" *Dale v. Town of Elsmere*, No. 99M-01-15-VAB, 2001 Del. Super. LEXIS 161, at *21 n.29 (Del. Super. Ct. Apr. 27, 2001) ("'The definition of a class cannot be so broad as to include individuals who are without standing to maintain the action on their own behalf. Each class member must have standing to bring the suit in his own right.'").

sold their shares into the open market). Texas courts, too, have rejected defendants' position. In the acquisition challenged by plaintiffs in the *Pate* action, "[m]ore than 99% of the outstanding shares were voted in favor of the merger." *Pate*, 2003 Tex. App. LEXIS 9681, at *3. Yet, the court did not exclude these shareholders from the class. CR 1653-58.

Defendants also argue that a class of Brigham shareholders as of the date of announcement of the merger cannot have claims related to a misleading proxy. Brigham AB 19. Again, this argument finds no support in Delaware law. *See Celera*, 59 A.3d at 426, 430 (discussing supplemental disclosures to shareholders in class that included shareholders who held stock as of the date of the announcement of the merger); *Celera*, 2012 Del. Ch. LEXIS 66, at *84-*88 (same); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356-57 (Del. 2008) (discussing plaintiffs' non-disclosure claims); *Prodigy*, 2002 Del. Ch. LEXIS 95, at *17-*18 (discussing remedial disclosures).

Defendants cite this controlling authority only in passing because it is fatal to their arguments. *See* Brigham AB 18-20. Defendants' primary authority in support of their argument, *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840 (Del. 1987), has been ***overruled*** by the Delaware Supreme Court. As the Chancery Court recognized in *Gesoff v. IIC Indus.*, 902 A.2d 1130 (Del. Ch. 2006), "*Kahn v. Lynch* implicitly overruled the holding in *Bershad*." *Id.* at

1143 n.89.  *Norberg v. Security Storage Co. of Wash.*, No. 12885, 2000 Del. Ch. LEXIS 142 (Del. Ch. Sept. 19, 2000), another decision cited by defendants, is an unpublished trial court decision handed down before *Celera*.  *Norberg* also relies on *Bershad*.[4]

Defendants also cite *Steinhardt v. Howard-Anderson*, No. 5878-VCL, 2012 Del. Ch. LEXIS 1 (Del. Ch. Jan. 6, 2012).  But, just as the unsuccessful objector did in *Celera*, defendants overstate the holding of *Steinhardt* in arguing that a shareholder who elects to sell his or her shares on the open market is improperly included in the class.  In *Steinhardt*, the lead plaintiff did not simply "sell stock in the open market."  Instead, as lead plaintiff, he received confidential information about the defendant company during

---

[4]     *Norberg* is also factually inapposite.  There, a shareholder filed a complaint alleging breach of fiduciary duty against the company's directors and majority shareholders.  2000 Del. Ch. LEXIS 142, at *1-*2.  While that action was pending, the defendants offered the dissenting shareholders who sought appraisal a settlement, which was approved by the court, that would allow them to accept the merger consideration.  *Id*. at *3.  After filing his original unfairness claim and after the settlement agreement was offered, Norberg tendered his shares to the company for the merger consideration without any caveat that he would continue to pursue litigation.  *Id*. at *7.  The court found that *Norberg* had acquiesced because he "abandoned his appraisal claim, challenged the fairness of the price and process and later, despite his declared assessment of the unfairness of the transaction, freely and voluntarily accepted the merger consideration." *Id*. at *25.  Unlike in *Norberg*, plaintiffs did not pursue an appraisal claim and certainly have not settled their claims against defendants.  *Celera*, 2012 Del. Ch. LEXIS 66, at *44 (distinguishing *Norberg* on these grounds).

In addition, even though the *Norberg* court found that the plaintiff had acquiesced in the merger, it still contemplated the certification of a class and reserved a decision on that issue pending the proposal of an adequate class representative.  2000 Del. Ch. LEXIS 142, at *29.

- 28 -

discovery and, while possessing that inside information, shorted the company's stock before the market learned of the strength of the class's claims. *Steinhardt*, 2012 Del. Ch. LEXIS 1, at *6-*7. While the court dismissed Steinhardt from the case, the court did not hold categorically that a lead plaintiff simply cannot sell his or her shares before the challenged transaction is consummated. Rather, because a lead plaintiff is a fiduciary to the class, the court in *Steinhardt* relied on the principle that "'[i]t is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship.'" *Id*. at *32. Here, by contrast, defendants do not claim and could not establish that plaintiffs used their fiduciary position to profit from the use of confidential information. *See Celera*, 2012 Del. Ch. LEXIS 66, at *58-*60 (distinguishing *Steinhardt* and refusing to find atypical and inadequate a class representative who sold shares into the open market).

Since *Celera*, no court has relied upon *Norberg*, *Bershad* or *Steinhardt* to preclude a shareholder's claim based upon the doctrines of acquiescence or waiver, to pare down a proposed class, or to deny a motion for class certification. Defendants omit this fact in their appeal. The class definition approved by the trial court is the proper formulation for breach of fiduciary

duty actions under Delaware law brought in connection with tender offers, such as this one.[5]

## III. The Trial Plan Adopted by the Trial Court Complies with *Brigham I* and *Bernal*

As required by Tex. R. Civ. P. 42 and *Bernal*, the trial court adopted a trial plan in granting class certification. That plan, 20 pages in length, reflects the court's "rigorous analysis" of the class claims and is the result of numerous hearings and thousands of pages of briefing and related submissions. Brigham AB, App. B.

It analyzes each of the claims certified for class treatment. *Id*. at 2-4. For plaintiffs' claims for breach of fiduciary duty, it identifies the governing law and the applicable burden of proof (*see id*. at 2-3); for plaintiffs' aiding-and-abetting claim, it identifies the standard governing the claim (*see id*.). It further identifies plaintiffs' theories and explains how plaintiffs intend to prove their claims, identifying the common, class-wide evidence that plaintiffs will introduce at trial to show liability, causation and damages. *Id*. at 13-17. It also

---

[5] Defendants' repeated characterization of this case as a "securities class action" (*see* Statoil AB xi, 2) reflects a fundamental misunderstanding of the claims asserted here. This is a case for breach of fiduciary duty under Delaware law, not for violations of federal securities statutes, and the requirements for proving a fiduciary duty claim (such as standing) differ from those necessary to prove a securities fraud claim.

explains how plaintiffs intend to calculate and allocate damages to the class. *Id*. at 16.

In addition, as directed by this Court in *Brigham I*, the trial plan states the elements of each defense asserted by defendants (*see* Brigham AB, App. B at 4-12), identifies the common issues of law and fact arising from those defenses (*see id*. at 16-20), and explains how the defenses will be tried in a manageable, time efficient manner. *See id*.; Tex. R. Civ. P. 42(c). As such, the trial plan complies with *Bernal*'s mandate that it explain how plaintiffs' claims and defendants' defenses can be tried on a class-wide basis.

### A. The Trial Plan Properly Analyzes Plaintiffs' Claims

#### 1. The Trial Plan Properly Analyzes How Damages Will Be Proven

***Citing no legal authority***, defendants first contend that computing damages in this case would raise individualized issues, because it would require the fact-finder to identify and evaluate the sales price for each share sold by class members following the announcement of the deal. Brigham AB 24-25. This contention is easily dispensed.

As explained above, under Delaware law, "[i]t is not the Merger that constitutes the wrongful act of which Plaintiffs complain; it is the 'fixing of the terms of the transaction.'" *Dieter*, 681 A.2d at 1072. Thus, it is the investors

who held shares ***at the time of the announcement*** of the merger who are damaged by defendants' misconduct. *Celera*, 59 A.3d at 426, 430.

Consistent with this principle, damages for victims of a breach of fiduciary duty in the context of a merger are determined by measuring the difference between the fair value of the company and the price offered. The first part of the equation – fair value – is established through expert testimony about the value of company acquired. The second part of the equation – price offered – is simply the per share amount offered by the acquiror. This is clearly explained in the trial plan adopted by the trial court. Brigham AB, App. B at 16-17.

This has long been the accepted damages measure in breach of fiduciary duty cases stemming from a merger. Only a couple of months ago, after a plaintiffs' verdict against two directors in a class action stemming from the acquisition of Dole Foods, the Delaware Court of Chancery employed this very formula to award $2.74 per share to each of the Dole shareholders who were harmed by the directors' breach of fiduciary duty. *In re Dole Food Co., Inc. S'holder Litig.*, No. 8703-VCL, 2015 Del. Ch. LEXIS 223, at \*149-\*150 (Del. Ch. Aug. 27, 2015); *see also In re PNB Hldg. Co. S'holders Litig.*, No. 28-N, 2006 Del. Ch. LEXIS 158, at \*5 (Del. Ch. Aug. 18, 2006) ("I conclude that the fair value of a share of PNB on the date of the Merger was $52.34, which is

$11.34 per share higher than the consideration offered in the Merger."); *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 107 (Del. Ch. 2014) (entering judgment and awarding damages to the stockholder class at an identical $4.17 per share for the plaintiff and each eligible class member).

Nothing about this formula requires the fact-finder to "identify all the different sales prices and the dates of the sales [for those shareholders who elected to sell into the open market after the announcement of the deal] in order to compute damages," as defendants argue. Brigham AB 24. Such an inquiry is irrelevant under Delaware law. *Joseph v. Shell Oil Co.*, No. 7450, 1985 Del. Ch. LEXIS 458, at *14 (Del. Ch. Feb. 8, 1985) ("In short, if a finding of damages occurs, the damages will be mathematically allocated on a per share basis to all the stockholders in similar circumstances. There is a total absence of individual issues and therefore there would be no reason for the Court to make a separate finding of damages as to each share or each shareholder.").

### 2. Plaintiffs Offer One Damages Theory

Defendants also contend that the trial plan "fails to address the impact of plaintiffs' conflicting damages theories on typicality and predominance." Brigham AB 41.

This argument makes no sense, as plaintiffs only offer one method of establishing damages. Plaintiffs intend to establish damages by measuring the

- 33 -

difference between the fair value of the company and the price offered. *See* Brigham AB, Appendix B at 16.

In any event, whether pitched under the guise of "individualized damages" or "conflicting damages theories," defendants' argument provides no ground for reversal. As explained above, Delaware law does not require a separate finding of damages as to each share or each shareholder. *See supra* §III.A.1. If liability and damages are established, each class member will receive an identical amount per share for each share of Brigham stock they owned at the time of the announcement of the deal. *Dole*, 2015 Del. Ch. LEXIS 223, at *154-*155 (awarding damages to the stockholder class at an identical $2.74 per share to each eligible class member); *Rural Metro*, 88 A.3d at 107 (entering judgment and awarding damages to the stockholder class at an identical $4.17 per share for the plaintiff and each class member). Because each shareholder is being awarded an identical amount per share, this damages measure does not raise commonality or typicality issues.

### 3. The Trial Plan Properly Explains Plaintiffs' Breach of Fiduciary Duty Claims

Defendants also contend that the trial plan is deficient because it did not analyze, under 8 Del. C. §102(b)(7), the applicability of the exculpatory

provision in Brigham's charter, and because it did not mention that plaintiffs supposedly must prove that the Board acted in bad faith. Brigham AB 40.

As an initial matter, the trial plan approved by the court did mention and discuss, at length, both of these issues. The trial plan specifically references bad faith in connection with its discussion of defendants' §102(b)(7) defense. *See* Brigham AB, Appendix B at 10. In addition, the trial plan repeatedly discusses the duty of good faith, and "'acting in bad faith' and 'not acting in good faith' are two sides of the same coin." *Dole*, 2015 Del. Ch. LEXIS 223, at *129; Brigham AB, Appendix B at 7, 9-11, 17.

Defendants essentially fault the trial court for not finding, at the class certification stage, that plaintiffs' claims are precluded as a matter of law. This, of course, would have been improper. "'[D]eciding the merits of the suit in order to determine the scope of the class or its maintainability as a class action is not appropriate.'" *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 315 (Tex. 2008).

Defendants argue that plaintiffs must prove that the Board acted in bad faith to prevail on their claims. Brigham AB 40. First, this issue has no impact on class certification, because, even if plaintiffs must show bad faith, that showing would need to be made by all class members – making it a common issue. Defendants do not contend otherwise.

- 35 -

Second, defendants' assertion is incorrect as a substantive matter. As the Delaware Supreme Court has made clear: "When a board of directors' loyalty is questioned . . . courts determine whether a conflict has deprived stockholders of a '***neutral*** decision-making body.'" *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1170 (Del. 1995) (emphasis in original). It further explained that "the manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body." *Id.* at 1170 n.25 (citing *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989)); *Rural Metro*, 88 A.3d at 85 ("The presence of an exculpatory provision does not eliminate the underlying duty of care or the potential for fiduciaries to breach that duty.").

Here, the Board and management were not only conflicted as a result of the $80 million they stood to gain in special payments if the deal closed, but Ben Brigham failed to comply with his "rigorous affirmative duty of disclosure" to his fellow Board members before seeking approval of the merger. *See Mills*, 559 A.2d at 1283; CR 688-89 (alleging that B. Brigham failed to disclose to the Board that he had a made a deal with Statoil for $36.50, when the Board had told him to hold firm at $40). Such misconduct deprives defendants of any protection provided by 8 Del. C. §102(b)(7) and the exculpatory provision in Brigham's charter. *Dole*, 2015 Del. Ch. LEXIS 223,

at \*97-\*98, \*124-\*134 (citing *Mills* and finding that 8 Del. C. §102(b)(7) did not exculpate two directors who breached their duty of loyalty by deceiving the special committee).

### 4. The Trial Court Properly Understood and Explained the Role of Plaintiffs' Claims Based Upon Defendants' Non-Disclosures

Defendants also contend that the trial court "demonstrate[d] a lack of rigor" when it included reference to the duty of candor (also commonly referred to as the duty to disclose) in the class certification order and trial plan. Defendants say the breach of duty of candor is "a nonexistent legal claim." Brigham AB 39.

This is incorrect. Delaware recognizes that directors who fail to disclose material facts to shareholders in connection with a merger, or make a false representation, have violated their legal duties to shareholders. As the Delaware Chancery Court in *Chen v. Howard-Anderson*, 87 A.3d 648 (Del. Ch. 2014) recently explained in rejecting the very argument defendants make here:

> [D]efendants argue that because the Merger closed, and because it was not a short-form merger or a merger involving a controlling stockholder, it is no longer possible for this court to award a remedy for a breach of the duty of disclosure, warranting summary judgment in their favor. That is an incorrect statement of current Delaware law.

> If the plaintiffs prove at trial that the defendants committed a non-exculpated breach of the fiduciary duty of disclosure, then damages can be awarded using a quasi-appraisal measure.

*Id*. at 691 (citing *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1 (Del. 2014)) (surveying Delaware decisions); *see also Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998). This so-called "nonexistent legal claim" recently resulted in a $75.7 million plaintiffs' verdict after a class trial in *Rural/Metro*. *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 213 (Del. 2014) (post-trial decision setting the amount of the advisor's liability for false information in proxy statement at $75.7 million).

Defendants also contend that plaintiffs dropped this claim, making too much out of plaintiffs' statement that they are not seeking specific monetary damage for the alleged non-disclosures. Brigham AB 34-35. But just because plaintiffs do not seek specific monetary relief on the basis of the non-disclosures does not mean that the non-disclosure allegations are irrelevant to plaintiffs' claims and have no role in this case. Under Delaware law, non-disclosure allegations implicate the duty of care and the duty of loyalty. *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 597-98 (Del. Ch. 2007) ("where there is reason to believe that the board lacked good faith in approving a disclosure, the violation implicates the duty of loyalty"); *Crescent/Mach I Partners, L.P. v. Turner*, No. 17455, 2000 Del. Ch. LEXIS

145 (Del. Ch. Sept. 29, 2000) ("The fiduciary duty of disclosure arises as a subset of a director's fiduciary duties of loyalty and care.").

Thus, as the trial plan explains, plaintiffs will make an affirmative showing on non-disclosure in their case-in-chief. *See* Brigham AB, App. B at 16. The trial plan correctly analyzes the duty of candor within the context of plaintiffs' claims for care and loyalty. *See* Brigham AB, App. B at 16. The trial plan also correctly recognizes that, if plaintiffs prove a breach of the duty of candor, it will defeat several of defendants' affirmative defenses, because those defenses require that shareholders were informed of all material facts surrounding the acquisition. Brigham AB, App. B at 7-8, 19-20; *see infra* §III.B.1.b. And, importantly, the trial plan explains how the non-disclosures can be proved through evidence common to the class. Brigham AB, App. B at 16.

### 5. The Trial Plan Properly Analyzes Plaintiffs' Aiding-and-Abetting Claims Against Statoil

Appellees are at a loss to explain Statoil's argument that the trial plan "failed to account" for and "ignored" the "knowing participation" element of plaintiffs' aiding-and-abetting-claim under Delaware law. Statoil AB 17. This assertion is blatantly false.

The trial plan clearly identifies the "knowing participation" element of an aiding-and-abetting claims, citing the relevant authority, and lays out the standard plaintiffs must meet to satisfy this element. It states:

> To prevail on their claim for aiding and abetting a breach of fiduciary duty, plaintiffs must prove: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) *knowing participation* in that breach by Statoil; and (4) damages proximately caused by the breach. *As to the third element – knowing participation, plaintiffs must show that the buyout group "'sought to induce the breach of a fiduciary duty'" or "'make factual allegations from which knowing participation may be inferred.'"*

*See* Statoil AB, App. B at 4.

In its brief, Statoil also complains that the trial plan ignores the four ways in which a plaintiff can satisfy the "knowingly participation" element of an aiding-and-abetting claim. *See* Statoil AB 17. But the *exact language* cited by Statoil is incorporated into the trial plan. *Compare* Statoil AB 17 with Brigham AB, App. B at 4-5.

Additionally, Statoil, like Brigham, faults the trial court for not finding at the class certification stage that plaintiffs could not prevail on the merits of their aiding-and-abetting claims, speculating that the claims would have been dismissed in Delaware. Statoil AB 18. As noted above, this would have been improper, because a trial court does not decide the merits of a suit in determining whether class certification is appropriate. *See supra*, III.A.3.

- 40 -

At the class certification stage, a trial court must only understand the nature and extent of the claims sought, so that it can determine if the claims can be tried class-wide. *Daimler Chrysler*, 252 S.W.3d at 315. That the trial court did. As explained in the trial plan, plaintiffs' aiding and abetting claim is predicated on plaintiffs' breach of fiduciary duty claim. Brigham AB, App. B at 15. Plaintiffs' claims share three of the same elements and thus, will rely on much of the same proof, such as internal Brigham and Statoil documents, testimony from Brigham's directors and officers and certain of its executives, e-mails and other correspondence between Brigham and Statoil, and documents and testimony from the financial advisors retained by Brigham and Statoil. All of this evidence is common to the class, and Statoil does not suggest otherwise.

It is clear under Delaware law that aiding-and-abetting claims in the merger context rest on common, class-wide proof. *See Rural Metro*, 88 A.3d 54 (finding, after class-wide trial, that the directors of Rural Metro Corp. had breached their fiduciary duties to a class of shareholders in connection with a sale of the company and that the Board's financial advisor had aided and abetted that violation). This is precisely why Statoil levies an attack on the

merits of plaintiffs' claim, rather than arguing that the aiding-and-abetting claim raises individual issues.[6]

### B. The Trial Plan Properly Analyzes Defendants' Pleaded Defenses

As noted above, the trial court's analysis of defendants' defenses was the focus of this Court's decision in *Brigham I*, 2014 Tex. App. LEXIS 9068, at *9-*10. Defendants nevertheless bury their arguments concerning their defenses in the middle of their brief – the position typically reserved for an appellant's weakest arguments. Understandably so, as they find no support in Delaware law.

Defendants focus on five of the 13 alleged defenses – acquiescence, ratification, estoppel, waiver and the proportionate responsibility. Brigham AB 25-33. Defendants say the 20-page trial plan adopted by the trial court, more than half of which is dedicated to defendants' pleaded defenses, "glosses over" how these defenses bear on the class certification analysis under Tex. R. Civ. P. 42. Brigham AB 26. They are wrong, for the reasons discussed below.

---

[6] Despite contending that plaintiffs' aiding-and-abetting claims have no merit – calling them "outlandish" – Statoil notably has never moved for summary judgment in the four years this action has been pending. Statoil AB 2. The reason for that is simple: discovery has turned up considerable evidence that Statoil sought to induce a breach of fiduciary duty. For example, Statoil was informed that Ben Brigham did not have Board authorization to agree to a deal at $36.50, yet nevertheless encouraged him to obtain full Board approval of the deal. CR 434-35.

**1. The Court Fully Understood and Gave Due Consideration to the Effect of Defendants' Alleged Defenses of Acquiescence, Ratification, Estoppel, and Waiver**

The rigorous analysis required under *Bernal* at class certification is not a one-way street. That standard applies equally to both plaintiffs' claims and defendants' defenses. Thus, just as plaintiffs cannot ***obtain*** class certification by relying solely on assertions of commonality and predominance, defendants cannot ***defeat*** certification by asserting myriad defenses and then proclaiming that they must be allowed to pursue these defenses on an individual-by-individual basis. As the Texas Supreme Court recognized in *BMG Direct Marketing, Inc. v. Peake*, 178 S.W.3d 763 (Tex. 2005), one of defendants' primary authorities, "in many cases it would be unfair to allow a defendant to preclude class certification simply by alleging an affirmative defense." *Id*. at 778. Yet that is exactly what defendants attempt to do here.

**a. Delaware Has Repeatedly Found These Defenses Inapplicable to Plaintiffs' Claims**

Defendants do not grapple with the most troubling flaw in their position. The Delaware Supreme Court has already rejected the notion the acquiescence, ratification, waiver and estoppel doctrines have any application to plaintiffs' claims.

- 43 -

In *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009), the Delaware Supreme Court held that shareholders do not "ratify" a merger by tendering their shares: "the ratification doctrine does not apply to transactions where shareholder approval is statutorily required." *Id*. at 714. Here, as defendants acknowledge, shareholder approval – *i.e.*, shareholders being convinced to tender their shares to Statoil – was "statutorily required" in order for Statoil to execute the top-up option and complete the back-end of the short-form merger. *See* 8 Del. C. §253 (requiring threshold of shares to complete short-form merger). Because shareholder approval was statutorily required, defendants' "ratification" defense is baseless as a matter of law.

Similarly baseless is the assertion that the acquiescence, waiver and estoppel doctrines are a defense to plaintiffs' claims. As noted above, in *Celera*, the Delaware Supreme Court held that a plaintiff (NOERS) who sold all of its shares into the open market before the merger closed was not subject to "equitable defenses" such as "waiver" and "acquiescence." 59 A.3d at 431. Just like here, *Celera* involved the acquisition of a publicly traded company via a tender offer with a back-end top-up option. *Id*. at 425. An objector, BFV, argued that NOERS had acquiesced in the merger and had waived its claims by selling its shares. *Id*. at 426-27, 431. The court overruled the objection, finding that plaintiff had standing to pursue its claims, that plaintiff was an adequate

- 44 -

class representative, and that the trial court had correctly certified a class which included shareholders who held shares at the date of the Board's approval of the merger agreement. *Id.* at 431; *Celera*, 2012 Del. Ch. LEXIS 66, at *36 ("the mere act of tendering one's shares while simultaneously pursuing an equitable claim is not sufficient to show acquiescence").

In so doing, the Delaware Supreme Court affirmed the findings of the Chancery Court, which held that such equitable defenses did not apply for at least two reasons. First, "[w]here a squeeze-out merger extinguishes the minority's legal right to remain shareholders of the corporation, 'the "choice" between accepting the possibly inadequate merger consideration and pursuing a possibly inadequate appraisal remedy' is not 'a meaningful choice.'" *Celera*, 2012 Del. Ch. LEXIS 66, at *39; *Celera*, 59 A.3d at 431. Here, too, because defendants structured the deal as a tender offer, and because the Board granted Statoil the right to purchase newly-issued shares so as to allow it to cross the 90% short-form threshold (upon obtaining 50% of the outstanding shares), class members were left without a meaningful choice. *Celera*, 59 A.3d at 431 ("where minority shareholders are faced with a choice between accepting an inadequate merger buy-out or pursuing inadequate appraisal, the shareholders did not acquiesce in the merger by accepting the buy-out").

Second, the requirement that a shareholder show "unequivocal approval of the transaction" could not be met. Unlike the ordinary context of a long-form merger with a shareholder vote, in the context of a two-tiered tender offer with a back-end top-up option (again, the structure of the transaction at issue here), shareholders are "'powerless to do anything about'" the merger. *Celera*, 2012 Del. Ch. LEXIS 66, at \*43. Defendants **ignore** this controlling authority.

### b. Even if They Applied, Defendants' Pleaded Defenses Do Not Preclude Class Certification

Notably, despite authority holding that defendants' defenses do not apply as a matter of law, the trial court did not just dismiss them out of hand as inapplicable. It instead assumed that the defenses applied to plaintiffs' claims and analyzed their role at a class trial. Brigham AB, App. B at 19-20.

As defendants acknowledge, an essential factual predicate for applying the acquiescence, ratification, waiver, and estoppel doctrines is that the shareholder was fully informed of all material facts. Brigham AB 26. Here, as part of their duty of care and duty of loyalty claims, plaintiffs contend that the class was not fully informed when they tendered their shares to Statoil. CR 41-54. Plaintiffs will make this showing in their case-in-chief.

As explained in the trial plan, if plaintiffs establish that defendants did not disclose these facts, plaintiffs will prevail on their claims and will negate

one of the essential elements of the defenses. *Gantler*, 965 A.2d at 712 (where the plaintiff alleges a "cognizable claim that the [14D-9] contained a material misrepresentation, [that allegation] eliminates an essential predicate for applying the doctrine [of ratification], namely, that the shareholder vote was fully informed"). If plaintiffs do not establish that defendants withheld material information, plaintiffs' claims fail and defendants are entitled to judgment on that claim, without the need for a separate finding on the defenses. *See Corwin v. KKR Fin. Holding, LLC*, No. 629, 2015 Del. LEXIS 473, at *21 (Del. Oct. 2, 2015) (addressing the impact of a showing of nondisclosure of material information on the ratification defense). Either way, these defenses will be disposed of as the parties litigate the merits of plaintiffs' claims.

Ignoring this, defendants say that their defenses will require an inquiry into the state of mind of each individual class member. Brigham AB 28. But this is not the law in Delaware. In Delaware, a shareholder's state of mind is ***irrelevant***. *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) ("For the defense of acquiescence to apply, conscious intent to approve the act is ***not*** required . . . ."); *see id.* (plaintiff's "conscious intent" is ***immaterial*** to an acquiescence finding); *Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943) ("Conscious intent is ***not*** an element, nor does ratification require a change of

position or prejudice."); *Bundesen v. Beck*, No. 11,347, 1992 Del. Ch. LEXIS 42, at \*26 (Del. Ch. Feb. 12, 1992) ("Estoppel does **not** require intent . . . .").

In *Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broad. Sys. Inc.*, No. 9209-VCG, 2015 Del. Ch. LEXIS 141 (Del. Ch. May 19, 2015), the Delaware Chancery Court was recently confronted with this issue in the context of a motion to compel discovery into the state of mind of shareholders. *Id*. at \*13. The court rejected the motion on the ground that the discovery was irrelevant:

> Plaintiffs point out . . . that they should at least be able to take discovery about the state of mind of their predecessors, assuming those predecessors can be identified . . . . **The problem with that assertion, again, is that acquiescence is focused on the understanding of the Defendant**. The record is clear that the Plaintiffs and their predecessors, owners of Series B Preferred Stock at the time the complained-of debt was incurred, had actual or constructive notice that SBS intended to acquire the debt, and stood silent. **Their intent in so doing is not pertinent here.**

*Id.* at \*13-\*14. The court further explained that acquiescence requires "'the other party to believe'" that the plaintiffs had acted in a way to lead them to believe "'the act ha[d] been approved. For the defense of acquiescence to apply, *conscious intent to approve the act is not required, nor is a change of position or resulting prejudice*.'" *Id*. at \*13 n.18.

Defendants eschew this authority in favor of several inapplicable decisions from Texas which arise under different circumstances. They do not

- 48 -

involve Delaware substantive law and certainly do not involve a breach of fiduciary duty claim by a shareholder. Instead, they involve claims under Texas common law for negligence stemming from plaintiff's exposure to asbestos (*Louisiana-Pacific Corp. v. Andrade*, 19 S.W.3d 245, 247 (Tex. 1999)), a misrepresentation claim under Texas common law against an employee leasing company (*Texas Workers' Comp. Ins. Facility v. Personnel Servs.*, 895 S.W.2d 889, 890 (Tex. App.–Austin, 1995, no writ)), and personal injury claims under Texas common law for mental anguish caused by the sight and sound of an explosion at an oil refinery (*Bernal*, 22 S.W.3d at 429). The only Delaware authority cited by defendants, *Nevins v. Bryan*, 885 A.2d 233 (Del. Ch. 2005), likewise did not involve a merger, shareholder-plaintiffs, or a breach of fiduciary duty claim, but instead, involved a plaintiff who challenged his removal as a director of a non-profit corporation.

Defendants also regurgitate their argument that Delaware courts have applied the doctrines of waiver and acquiescence to dismiss lawsuits (*see* Brigham AB 30), citing *Norberg* and *Bershad*, but, as discussed above, those decisions have been overruled on the points for which defendants cite them and are no longer good law. *See supra* §II.

### c. Defendants Cannot Overcome the Reality that These Types of Cases Are Routinely Certified and Tried on a Class-Wide Basis

The legal and practical realities concerning the acquiescence, ratification, waiver, and estoppel doctrines explain why these cases are routinely certified and tried on a class-wide basis, even though these defenses are routinely pleaded by defendants.

This Court need look no further than two recent trials from Delaware to recognize that potential defenses such as acquiescence will not, as defendants contend, "require countless mini-trials." *See* Brigham AB 29. As here, *Dole* and *Rural Metro* were two breach of fiduciary duty cases stemming from a completed acquisition of a publicly listed company. And, as here, defendants asserted defenses based upon the doctrines of acquiescence, ratification, waiver and estoppel. SCR, Ex. 1 at 32-38 (*Rural Metro*, Answer to Verified Second-Amended Complaint); *id.* (*Dole Food*, Answer and Affirmative Defenses). These defenses did not prevent a class-wide trial in those actions and they will not do so here, either. In fact, all of the claims and defenses in the *Dole* and *Rural Metro* cases were resolved, in plaintiffs' favor, in a single trial.

Similarly, in *Pate*, defendants asserted that plaintiffs' claims "were extinguished by the fully informed shareholder vote approving and ratifying the

- 50 -

merger." App. A at 3. Yet, the certified class included "'all persons or entities, other than defendants, who were Pennzoil-Quaker State Corp. shareholders of record on August 1, 2002.'" CR 1058. After class certification was upheld by the Texas Court of Appeals, the case was tried to verdict on a class-wide basis in three weeks. *See Pate*, 2004 Tex. LEXIS 1160; *Pate*, 2005 Tex. LEXIS 305.

Defendants simply have no explanation as to why plaintiffs' claims cannot be tried on a class-wide basis, when it is routinely done in other actions involving the same claims, same defenses and transactions structured in the same way. Cases such as *Pate*, *Rural/Metro* and *Dole* – only a few of many examples – have proven that cases such as this do not create manageability or commonality problems.

### 2. The Court Properly Analyzed Defendants' "Proportionate Responsibility" Defense

Recognizing that their defenses based on the doctrines of acquiescence, ratification, waiver and estoppel will not carry the day, defendants rushed to amend their answer after *Brigham I* to add a purported defense based upon the doctrine of proportionate responsibility under Tex. Civ. Prac. & Rem. Code Ann. §33.002(a)(1). In their appeal, defendants claim the trial court must submit a question to the jury apportioning responsibility for harm between the

parties, and that the trial court failed to account for this "defense." Brigham AB 38-39.

This doctrine, however, is a creature of Texas substantive law and does not apply to plaintiffs' claims. Plaintiffs' claims are governed by the substantive law of Delaware because Brigham was a Delaware corporation – a point defendants do not dispute. Article 8.02 of the Texas Business Corporation Act provides that the internal affairs (including the actions of its Board Members) of a foreign corporation doing business in Texas are controlled by the substantive law of the state of incorporation. Texas' proportionate responsibility statute, Tex. Civ. Prac. Rem. Code Ann. §33.002(a)(1), is substantive, not procedural law. *Harris Constr. Co. v. GGP-Bridgeland, LP*, No. H-07-3468, 2009 U.S. Dist. LEXIS 69476, at *3 n.1 (S.D. Tex. Aug. 10, 2009) ("Texas proportionate responsibility statutes reflect a substantive state policy" and are not procedural)*; cf. Cooper v. Ross & Roberts, Inc.*, 505 A.2d 1305, 1307 (Del. Ch. 1986) ("prejudgment interest, like the issue of damages, is substantive, and the state whose laws govern the substantive legal questions also govern the question of prejudgment interest"). Thus, this "defense" is not available to defendants here.

In any event, defendants offer nothing to establish that the doctrine of proportionate responsibility would play any role at a trial on plaintiffs' claims.

- 52 -

Any finding of proportionate fault must, of course, be grounded in some legally culpable act by plaintiffs. *See* Tex. Civ. Prac. & Rem. Code Ann. §33.003.

But, tellingly, defendants are silent on this point, failing to identify any legal duty owed by plaintiffs to defendants. Defendants' omission is not an oversight. While directors of a company owe a fiduciary duty to plaintiffs in connection with an acquisition, the reverse is not true. Non-insider shareholders do not owe legal duties to a company or its directors under Delaware law. *Yucaipa Am. Alliance Fund II, L.P. v. Riggio*, 1 A.3d 310, 357 n.245 (Del. Ch. 2010) ("the board owes fiduciary duties to the company, something Yucaipa, as a stockholder, generally does not"). As such, there is no duty for plaintiffs to breach, and they cannot be held liable for some percentage of harm caused by defendants' misconduct.

Defendants also need to provide evidence of wrongdoing (along with some evidence establishing a causal connection between that wrongdoing and the harm) before any question regarding proportionate responsibility can be submitted to the jury. Tex. Civ. Prac. & Rem. Code §33.003(b). Again, despite having many opportunities to do so, defendants have never made any such showing or even explained what their showing at trial might entail.

In their appeal, defendants contend that "[s]hareholders who chose to sell in the open market . . . are potentially responsible for all or part of any alleged

- 53 -

harm." Brigham AB 38. Again, defendants cite no authority for this proposition because there is none. As a matter of law, selling shares into the open market is not a basis for the jury to re-apportion fault between the parties because it is not a legally culpable act. Shareholders are free to sell their shares into the open market. *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 78 (Del. Ch. 1999) ("stockholders . . . are ordinarily free to sell their shares, and purchasers who . . . ordinarily free to buy those shares"); Brigham AB 38-39. To plaintiffs' knowledge, no court – in Delaware or elsewhere – has found that shareholders bear some responsibility for the harm caused by a board's failure to fulfill its fiduciary duties. Nor have they applied the doctrine of comparative fault to diminish or preclude a shareholder's recovery in circumstances even remotely similar to those presented by this case.

## IV. Plaintiffs Satisfied the Requirements for Class Certification

Defendants also raise challenges to the trial court's findings on several of the class certification requirements. Rule 42 of the Texas Rules of Civil Procedure authorizes a trial court to certify actions for class treatment. Certification of a proposed class is appropriate where the party proposing a class action shows that: (i) the class is so numerous that joinder of all members is impracticable; (ii) there are questions of law or fact common to the class; (iii) the claims or defenses of the representative parties are typical of the claims

- 54 -

or defenses of the class; and (iv) the representative parties will fairly and adequately protect the interests of the class. Tex. R. Civ. P. 42(a). Common questions of fact or law must predominate over questions affecting only individual members, and a class action must be superior to other available methods for the fair and efficient adjudication of the controversy. Tex. R. Civ. P. 42(b).

On appeal, defendants do not raise any objections to the trial court's findings regarding commonality. As such, defendants have waived any claim of error on this prerequisite and it is not at issue on this appeal. Tex. R. App. 38.1(e) (the appellant's brief must state concisely all issues or points presented for review).

### A. The Trial Court Acted Within Its Discretion in Finding that Plaintiffs' Claims Are Typical

In a variation on their previous argument that the class definition is overbroad, defendants contend that the trial court's finding that plaintiffs' claims are typical of the Class is in error. In particular, they argue that plaintiffs' claims are atypical of the claims of the class because plaintiffs sold their shares into the open market and did not tender their shares to Statoil. Brigham AB 43.

This is another argument that has been considered and rejected by the Delaware Supreme Court. In *Celera*, 59 A.3d 418, the Delaware Supreme Court held that there was no atypicality between the plaintiffs, who had not tendered their shares, and the class members who had had tendered shares. Defendants cite *Celera* in passing, but fail to acknowledge its holding. Indeed, as noted above, despite the fact that the doctrines of acquiescence, ratification, waiver or estoppel are regularly asserted by defendants, these cases are tried on a class-wide basis. *See supra* §III.B.1.c.

In Delaware, when a corporate fiduciary commits a breach of duty, all shareholders at the time of the merger announcement are identically harmed. *Turner v. Bernstein*, 768 A.2d 24, 33 (Del. Ch. 2000) ("[i]n challenges to corporate mergers brought on behalf of the shareholders not affiliated with the defendants, it is virtually never the case that there is any legitimate basis that a defendant might be found liable to some plaintiffs but not others"). That certainly holds true in this case. All Brigham shareholders at the time the merger agreement was announced became victims of the unfair process used to force the acquisition; all were denied fair value of their shares; and all were harmed by defendants' self-dealing. *Bernal*, 22 S.W.3d at 435 (the claims of the class representative need not be identical or perfectly coextensive with

those of the class as a whole; the claims need only be substantially similar with those of the class).

Defendants say that "[n]umerous courts have held that the disparity between tendering and non-tendering shareholders prevents plaintiffs from satisfying the typicality requirement" – citing *Andra v. Blount*, 772 A.2d 183 (Del. Ch. 2000), and *Shapiro v. Pabst Brewing Co.*, No. 7339, 1985 Del. Ch. LEXIS 496 (Del. Ch. July 30, 1985) – both of which were decided **before** *Celera*.

*Andra* has no relevance here for numerous reasons. Most importantly, as at least one Delaware court succinctly stated, "*Andra* was **not** an acquiescence case." *Clements v. Rogers*, 790 A.2d 1222, 1239 (Del. Ch. 2001). Nor did it involve class certification. *Andra*, 772 A.2d at 196.

*Shapiro*, issued nearly 30 years ago, likewise did not involve class certification. In *Shapiro*, minority shareholders claimed that appraisal was not an available remedy at a time when it was believed that appraisal was the exclusive remedy for minority shareholders. *Shapiro*, 1985 Del. Ch. LEXIS 496, at *10. The trial court dismissed plaintiffs' claims because plaintiff did not allege "facts which, if true, would render the appraisal remedy inadequate." *Id.* at *12. In a subsequent decision, the Delaware Supreme Court effectively overturned the *Shapiro* decision by making clear that appraisal was not an

- 57 -

exclusive remedy.  *See Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1108 (Del. 1985).  Therefore, a plaintiff would no longer be required to plead why appraisal was "inadequate."  Even though it was issued more than 30 years ago, no Delaware court has relied on or cited *Shapiro* for the proposition cited by defendants.

## B.     The Trial Court Acted Within Its Discretion in Finding that Common Issues Predominate

Both of defendants' arguments concerning predominance are nothing more than a regurgitation of their previous arguments as to the trial plan's treatment of their defenses.

First, citing no Delaware law, defendants say each shareholder will need to be examined individually about their state of mind to determine if defendants' affirmative defenses apply.  Brigham AB 44.  But, as discussed above, this is not true.  *See supra* §III.B.1.b.  Second, defendants argue that it is necessary to individually evaluate whether each shareholder suffered damage as a result of the merger.  Brigham AB 44-45.  Again, this is incorrect.  *See supra* §III.A.1.

## C.     The Trial Court's Numerosity Finding Was Sufficiently Supported

Although defendants did not raise any issue as to the trial court's finding on numerosity in their first appeal, they do so here.  Echoing an argument at least one Texas court has characterized as "pure sophistry," defendants contend

that certification must be denied because plaintiffs have not shown the precise number of shareholders who still held their shares at the close of the tender offer. Brigham AB 45; *Snyder Commc'ns v. Magana*, 94 S.W.3d 213, 239-40 (Tex. App.–Corpus Christi 2002, pet. filed).

The Court need not reach this issue, however, as it has been waived. "Where error exists at the time of an initial appeal, an appellant waives its right to complain in a subsequent appeal of the error it failed to present in the initial appeal." *Women's Clinic of S. Tex. v. Alonzo*, No. 13-12-00537, 2013 Tex. App. LEXIS 7263, at *4 (Tex. App.–Corpus Christi June 13, 2013, pet. denied).

In any event, this argument fails on substantive grounds for two reasons. First, defendants' challenge is predicated on the incorrect assertion that the class is overbroad because it includes shareholders who sold their shares prior to the completion of the merger. As explained above, so long as shareholders held stock at the time of the announcement, they are properly included within the class. *See supra* §II.

Second, even if certification was proper only as to shareholders who held their shares as of the close of the tender offer, the numerosity prerequisite would still be satisfied. The numerosity requirement, in particular, "is not based on numbers alone." *Methodist Hosps. of Dallas v. Tall*, 972 S.W.2d 894, 898 (Tex. App.–Corpus Christi 1998, no pet.). Rather, the test is whether

joinder of all members is practicable in view of the size of the class and includes such factors as judicial economy, the nature of the action, geographical location of class members, and the likelihood that class members would be unable to prosecute individual lawsuits. *Rainbow Group, Ltd. v. Johnson*, 990 S.W.2d 351, 357 (Tex. App.–Austin 1999, pet dism'd w.o.j.). Defendants do not challenge any of these factors, conceding that they are met.

As to the size of the class, there is sufficient evidence to support a finding that there are enough class members to render joinder impracticable. As defendants acknowledge, there were over one hundred million shares of Brigham stock issued and outstanding at the time of the announcement. CR 130; CR 459 (117,318,932 shares outstanding prior to the acquisition). Even if a large percentage of shareholders disposed of their shares before the close of the tender offer, which is unlikely given the short, one-and-a-half month tender offer period, there would still be thousands of shareholders within the class. This is easily enough to satisfy numerosity. *Chevron U.S.A., Inc. v. Kennedy*, 808 S.W.2d 159, 161-62 (Tex. App.-El Paso 1991, writ dism'd w.o.j.) (finding no error in certification of a class comprised of 20 identifiable members).

**D.    The Trial Court Acted Within Its Discretion in Finding that Plaintiffs Will Fairly and Adequately Protect the Interests of the Class**

Defendants' adequacy challenge rests on arguments made in the Statoil Appellants' brief. Brigham AB 46-47. In its brief, Statoil offers a novel and unprecedented perspective on class certification, contending that plaintiffs are inadequate class representatives, but only as to the aiding-and-abetting claim against Statoil. It makes no argument as to plaintiffs' adequacy as to the underlying claim for breach of fiduciary duty against Brigham and the individual defendants.

Yet Statoil cites not a single case – in Texas or elsewhere – in which a court has found a plaintiff to be an adequate representative for purposes of one claim, but inadequate for purposes of another. There is none. In Texas, courts do not evaluate adequacy on a claim-by-claim (or defendant-by-defendant) basis. And indeed, the Class plaintiffs seek to represent here was not defined in this manner. Instead, adequacy is determined by evaluating a plaintiff's ability to fairly and adequately protect the interests of the entire class – here, the former shareholders of Brigham.

To establish his or her adequacy, a plaintiff must only demonstrate that he or she is familiar with the "basic issues" of the case and actively involved in the litigation. Here, as discussed below, the record – which includes affidavits,

- 61 -

nearly 30 hours deposition testimony and live testimony from the plaintiffs at the class certification hearing – contains ample evidence supporting the trial court's findings concerning plaintiffs' adequacy. Going well beyond what is necessary to qualify as a class representative, plaintiffs established that they conducted independent investigations both before and after the case was filed; initiated the litigation because they were "surprised," "befuddled" and "upset" about the merger; have reviewed key pleadings, depositions and other materials produced by defendants and third parties in litigation; have assisted and directed counsel throughout the litigation; and have participated in discovery and attended important hearings. Several plaintiffs have done even more. As such, they are familiar with the key facts and issues supporting their claims – the terms, timing and structure of the merger, Brigham and its operations, Brigham's directors and executives, the buyer (Statoil), the scope of the class, and the duties upon which their claims are based, among other things. Quite clearly, plaintiffs are committed to protecting the interests of class members, and Statoil's plea for reversal does nothing to refute the trial court's findings in this regard.

To the extent it is necessary for plaintiffs to be familiar with Statoil, again, there is ample evidence in the record to support a finding that they are. In addition to the testimony described above, plaintiffs testified that they are familiar through their research with Statoil and its operations, its assets, and its

role in the buyout of Brigham. And, contrary to Statoil's contention, plaintiffs understood that Statoil is a defendant and explained the actions of Statoil that led to the suit. Statoil's suggestion that this is a "lawyer-driven" litigation – and that the trial court qualified plaintiffs as class representatives without any serious vetting of their qualifications – is completely baseless.

### 1. Adequacy Findings Are Entitled to Substantial Deference

Statoil faces a tall task in seeking reversal on adequacy grounds. "Adequacy of representation is a question of fact" and must be determined based on the individual circumstances of each case. *Farmers*, 125 S.W.3d at 66. Because adequacy is a fact question left to the discretion of the trial court, "the trial court does not abuse its discretion in finding adequacy if there is evidence to support the finding." *Id.* at 66; *Garcia v. Walker*, No. 04-05-00343-CV, 2006 Tex. App. LEXIS 1409, at *5-*6 (Tex. App.–San Antonio Feb. 22, 2006, no pet.) ("Under an abuse of discretion standard, we defer to a trial court's rulings when discretionary matters depend on the resolution of conflicting facts.").

In conducting appellate review, it also makes a difference how the named plaintiffs demonstrated their adequacy to the trial court. The deference to the trial court's findings is heightened where, as here, a class representative testifies live at an evidentiary hearing, enabling the trial court to assess the

person's credibility and demeanor. "A trial court has discretion to rule on class certification issues, and some of its determinations – like those based on its assessment of the credibility of witnesses, for example – must be given the benefit of the doubt." *Henry Schein Inc. v. Stromboe*, 102 S.W.3d 675, 691 (Tex. 2002); *Farmers*, 125 S.W.3d at 68 ("the trial court is in the best position to weigh the credibility of Leonard and Sawyer as well as to determine the ability and integrity of class counsel to represent the entire class").

Notably, even if defendants could meet their burden, to obtain reversal defendants would need to show that there was no factual basis for the trial court's findings for **all seven** plaintiffs. While the presence of multiple class representatives helps to ensure that the class claims are vigorously prosecuted, Tex. R. Civ. P. 42 does not require more than one representative. A single representative is sufficient to support a class certification order.

### 2. Statoil Concedes that Adequacy Is Met by Not Challenging the Vast Majority of the Factors Relevant to the Adequacy Determination

To appreciate how narrow Statoil's adequacy challenge is, it is necessary to understand the framework under which a trial court determines whether a plaintiff should be qualified as a class representative.

There are two components to the adequacy determination. First, it must appear that the representatives, through their attorneys, will vigorously

- 64 -

prosecute the class claims. *Forsyth v. Lake LBJ Inv. Corp.*, 903 S.W.2d 146, 150 (Tex. App.–Austin 1995, writ dism'd w.o.j.). Factors affecting this determination include the following: (1) counsel's adequacy; (2) the plaintiff's personal integrity; (3) the representative's familiarity with the litigation and his belief in the grievance's legitimacy; (4) whether the class is unmanageable, based on geographical limitations; and (5) whether the plaintiff can afford to finance the class action. *Id.* Second, there must be an absence of antagonism or conflict between the representative's interests and those of the class members. *Adams v. Reagan*, 791 S.W.2d 284, 291 (Tex. App.–Fort Worth 1990, no writ).

Of those two components, courts focus especially on the second component – intra-class conflicts of interest. "The primary issue to be considered is whether conflict or any antagonism exists between the interests of the [named plaintiffs] and those of the remainder of the class. However, "the conflict must be fundamental and go to the heart of the litigation." *Canyon Lake Island Prop. Owners Ass'n v. Sterling/Suggs L.P.*, No. 03-14-00208-CV, 2015 Tex. App. LEXIS 5739, at *19 (Tex. App.–Austin June 5, 2015, no pet. h.). Here, Statoil does ***not*** challenge the trial court's finding that the plaintiffs are free of conflicts that would prevent them from effectively representing other shareholders.

- 65 -

Nor does Statoil challenge the trial court's findings on four of the five factors relevant to the determination as to whether a class member will vigorously pursue the claims. *Forsyth*, 903 S.W.2d at 150. This alone is fatal to Statoil's appeal, as a plaintiff can qualify as a class representative even if one factor weighs against a finding of adequacy. *See Hi-Lo Auto Supply L.P. v. Beresky*, 986 S.W.2d 382, 388-89 (Tex. App.–Beaumont 1999, writ mand. denied) (upholding the trial court's adequacy finding even though the court assumed "[defendant] proved it [was] being targeted by unscrupulous plaintiffs' lawyers" and the plaintiff lacked personal integrity).

### 3. The Trial Court's Findings Regarding Plaintiffs' Familiarity with the Litigation Are Amply Supported by the Record

Even as to the one factor it does challenge – familiarity with the litigation, Statoil cannot meet its heavy burden of establishing that there was no factual basis for the trial court's finding. Statoil AB 9-17.

Although Statoil may prefer a higher standard, plaintiffs must only demonstrate that they are familiar with the "basic issues" of the case and are actively involved in the litigation. *Farmers*, 125 S.W.3d at 67 ("A class representative should be familiar with the basic issues, including composition of the class and damages sought."); *Pate v. Elloway*, No. 01-03-00187-CV, 2003 Tex. App. LEXIS 9681, at *16 (Tex. App.–Houston [1st Dist.] Nov. 13,

20013, pet. denied) (same). Class representatives are "not required to fully comprehend the legal terms and pleadings." *King v. City of Austin*, No. 03-03-00173-CV, 2004 Tex. App. LEXIS 2623, at *13 (Tex. App.–Austin Mar. 25, 2004, no pet.).

As in *Pate*, 2003 Tex. App. LEXIS 9681, which involved breach of fiduciary duty claims stemming from the Shell-Pennzoil merger, the named plaintiffs here have "demonstrated familiarity with the basic issues in the case." *Id.* at *13-*19. They initiated the litigation because they were upset with the merger price; sought and retained counsel to investigate and pursue their claims; have reviewed the key pleadings; conducted independent investigations both before and after the case was filed; have assisted and directed counsel throughout the litigation; have participated in discovery, including sitting for deposition, and are willing to participate at trial; and understand that they have a responsibility to ensure that class members are treated fairly. This is more than enough to satisfy adequacy.

Statoil does its best to ignore much of the named plaintiffs' testimony. In fact, outside of a single snippet from each of the plaintiffs' depositions, Statoil does not cite or discuss any of the over 1,000 pages of plaintiffs' testimony. Nor does Statoil discuss the many hours of plaintiffs' live testimony before the trial

court during the class certification proceedings.[7] Statoil's one-sided approach to the evidentiary record flouts a fundamental tenet of appellate procedure: "[t]he appellate court reviews the entire record" – not isolated snippets – "to determine if the trial court abused its discretion in [granting] certification." *Forsyth*, 903 S.W.2d at 149. When the entire record is reviewed, it is plain that there was ample support for the trial court's finding that plaintiffs are familiar with the facts and issues of the case, including the facts supporting their aiding-and-abetting claim against Statoil, and are actively involved in the litigation.

### a. Howard Weissberg

Mr. Weissberg established that he has taken an active role in and is familiar with the litigation. *Id.* at 150.

Mr. Weissberg, like three other class representatives (Messrs. Fioravanti, Whalen and Schwimmer) traveled hundreds of miles to personally attend and testify at the class certification hearing. CR 1627-80. His live testimony allowed the court to look him in the eye and judge for itself whether he could fairly

---

[7] The extensive process by which the trial court vetted the class representatives distinguishes this case from Statoil's primary authority, *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133 (N.D. Tex. 2014). In *Kosmos*, the "sole piece of evidence" in support of adequacy was a declaration which contained "no detail." *Id.* at 146-47. Here, in contrast, plaintiffs offered, in addition to affidavits, extensive deposition and hearing testimony to establish their adequacy. Also unlike here, *Kosmos* involved a federal securities claim brought under the PSLRA, which "raised the adequacy threshold." *Id.* at 140.

represent the class. Mr. Weissberg also expressed a willingness to appear at trial. CR 979.

Before purchasing Brigham stock, Mr. Weissberg investigated the Company through its stock price charts and earnings records, as well as numerous articles about the Company. CR 1629, 1632. Mr. Weissberg even performed his own economic valuation of Brigham based on the information he obtained through his independent investigation. CR 1643.

Mr. Weissberg became involved in the case after seeing the public announcement of the acquisition by Statoil. CR 1631. After seeing that Brigham shareholders would only receive $36.50 per share, he contacted a law firm. CR 1633. "[A]s soon as I saw the announcement, I felt that there was something wrong, that I was not going to get my long-term benefits from this deal." CR 1631.

Since then, Mr. Weissberg has reviewed the pleadings, including verifying the initial petition and reviewing the amended petition. CR 978. He reviewed deposition transcripts and key documents produced by defendants during the expedited discovery process. *Id.* Mr. Weissberg also read the lengthy Proxy Statement filed by Brigham with the Securities and Exchange Commission. 3SCR 406-08. He is familiar with the amount of money that Ben Brigham and the other individual defendants made in connection with the deal.

3SCR 383; CR 2036; CR 2042-43 (identifying David Brigham and Harold Carter and explaining what actions Mr. Carter failed to take).

He has also read the depositions of two Brigham employees taken in this action. 3SCR 399. To bolster his independent personal knowledge, Mr. Weissberg has reviewed between six and 12 detailed memoranda provided by his counsel, which described the claims, the status of the litigation, and his role as a class representative. 3SCR 386-87, 390. In addition, he has actively participated in discovery, sitting for deposition and providing responses to defendants' special interrogatories. CR 1645, 2047.

Mr. Weissberg also testified that he closely monitors his attorneys, staying in touch with them as a "regular routine." 3SCR 398; CR 1634-38. He speaks with his attorneys "[o]n a regular basis. Sometimes once, twice a week." CR 1638; 3SCR 398 (testifying at his deposition that he communicates with his attorneys "[q]uite frequently"). In the first stage of the litigation, when plaintiffs moved for injunctive relief, Mr. Weissberg advised his attorneys regarding the motion for preliminary injunction. CR 978. Further, for months before the class certification hearing, Mr. Weissberg participated in regular conference calls with class counsel and the other class representatives, during which they discussed plaintiffs' legal theories and experts to potentially be retained. CR 1637-38. Mr. Weissberg also demonstrated his familiarity with

Statoil, explaining that he was familiar with Statoil's headquarters in Norway and its operations in the United States. CR 2040; 3SCR 30. He knew that Fargo was the legal entity Statoil created to absorb Brigham in the merger. CR 2040.[8]

Statoil suggests that Mr. Weissberg did not understand that he was suing Statoil, but omits his testimony – ***provided earlier in the deposition*** – directly to the contrary.

Q. Who are you suing in this lawsuit, sir?

A. A lot of people, ***Statoil***, Brigham, Bud Brigham, Brigham Company.

CR 2041. Mr. Weissberg testified similarly at the hearing. CR 1675 ("Q. Now, as you sit here today, do you understand that you've sued Statoil? A. Yes."). In fact, during cross examination, defendants suggested, as they do here, that Mr. Weissberg did not understand during his deposition that he was suing Statoil. However, Mr. Weissberg refuted this point. CR 1676 ("Q. Right. But on the day of the deposition, you did not, right? A. I did know we sued

---

[8] Statoil overlooks the fact that plaintiffs' fiduciary duty and aiding-and-abetting claims significantly overlap and are based on the same underlying events. Thus, to the extent plaintiffs demonstrate knowledge of the facts supporting the fiduciary duty claim, plaintiffs likewise demonstrate knowledge of the facts supporting the aiding-and-abetting claim. *Stewart v. Wilmington Tr. SP Servs.*, 112 A.3d 271, 319 n.225 (Del. Ch. 2015) ("because of the significant overlap in their respective elements, much of the evidence for proving an aiding and abetting claim already would be coming in to prove the breach of fiduciary duty claim under the fiduciary duty carve-out to *in pari delicto*").

Statoil."). Mr. Weissberg then explained he sued Statoil because it is the company that bought Brigham, that Statoil is now responsible for Brigham, and that Brigham is no longer in business. CR 1679-80.

At most, Statoil has cited conflicting testimony about Mr. Weissberg's knowledge of Statoil. But that is not a basis for reversal. *Garcia*, 2006 Tex. App. LEXIS 1409, at *5-*6 ("Under an abuse of discretion standard, we defer to a trial court's rulings when discretionary matters depend on the resolution of conflicting facts."). Because there was ample evidence to support the trial court's finding that Mr. Weissberg was familiar with the litigation, including the claims against Statoil, the trial court did not abuse its discretion. *Farmers*, 125 S.W.3d at 66.

### b.    Walter Schwimmer

Like Mr. Weissberg, Dr. Schwimmer sat for deposition and testified live at the class certification hearing. CR 1681-1716. Dr. Schwimmer traveled from Los Angeles to attend the class certification hearing. CR 1681.

Dr. Schwimmer, a retired physician, was deeply familiar with Brigham through his personal research. He investigated Brigham before purchasing any stock in the Company, through his annual subscriptions to investment letters, articles available on the internet, and various news reports, including a Forbes magazine article. CR 1684; 3SCR 339-40. Upon learning of the deal, he was

- 72 -

"surprised" and called attorneys to inquire further about a potential lawsuit. *Id.* Notably, he did not immediately file suit. Instead, he "wanted more information" and carefully investigated the acquisition and any potential claims before deciding whether to file suit. CR 1687.

Only after investigating the merger further did Dr. Schwimmer decide to initiate a lawsuit. CR 1685-86. He did not "think [it] was right" that the Brigham directors were making off with between $40 and $60 million as a result of the deal, and that "there was a breach and it should definitely be acknowledged." CR 1686-87. He also "felt that the price [shareholders] got for the shares was not adequate. And that the board, which is supposed to represent all of the share owners and not just themselves, did something that was unfair to the public share owners." CR 1695. When asked what he was trying to achieve through the lawsuit, Dr. Schwimmer testified that "I'd like to see a monetary value of what the true value of what the company was being made to all the former owners." *Id.*

After filing suit, he has continued to conduct his own investigation. He receives "an ongoing service" of publications which he reviews on a monthly basis. He read several analyst reports and articles about the Brigham acquisition and provided them to counsel. 3SCR 339-40, 344; CR 1686-87. As part of his independent research, Dr. Schwimmer also investigated Statoil and

its involvement in the development of oil reserves in the Bakken, the same area in which Brigham operated.  3SCR 344.

Dr. Schwimmer also stays abreast of the status of the litigation in numerous ways.  He reads the memoranda provided by his attorneys (3SCR 345; CR 1688); participates in regular conference calls with the other class representatives, who owned Brigham stock (CR 1726-28); and maintains regular contact with his attorneys, who had "spent a lot, a lot, a lot of time" on this matter.  CR 2006.  Further, Dr. Schwimmer appeared for deposition and provided discovery responses based upon his personal knowledge.  CR 1693. Dr. Schwimmer expressed a willingness to be involved through a trial in this case.  CR 661.

Additionally, Dr. Schwimmer received and reviewed drafts of various pleadings in the litigation, including the petition before it was filed.  CR 1701, 1709.  Dr. Schwimmer also confirmed that he had "received drafts of the various pleadings and amended pleadings in the litigation, as well as reviewed discovery requests and responses and correspondence from [his] counsel regarding the litigation."  CR 660-61; 3SCR 290-92.

Contrary to Statoil's assertion, Dr. Schwimmer never testified that he did not understand he was suing Statoil.  At his deposition, defense counsel asked Dr. Schwimmer directly:

Q. Who are you suing?

A. I'll tell you from my own memory. We're suing the management, the board of directors of Brigham. *We're also suing Statoil* and . . . .

3SCR 351.

Nor, as Statoil suggests, was Dr. Schwimmer unable to explain why he was suing Statoil. Statoil AB 12, 14. He testified, "I have knowledge as to why we are suing Statoil." 3SCR 362. When asked at deposition how shareholders' interests were not taken into consideration, he explained that Brigham and Statoil had made a "handshake deal" for $36.50 which was not disclosed to the rest of the Board. 3SCR 352-53. He further explained that Statoil had offered Brigham and its directors a "special deal" – unavailable from other potential buyers – that resulted in millions of dollars in payments to the defendants and lucrative job positions with Statoil after the deal closed. 3SCR 353.

Nevertheless, Statoil maintains that the trial court erred in finding Dr. Schwimmer adequate because he relied, in part, on his attorneys when determining whether to sue Statoil. But there is nothing inadequate about a class representative who consults their attorneys before deciding to bring a claim. In fact, this is exactly what a plaintiff should do to ensure the class is protected. *Pate*, 2003 Tex. App. LEXIS 9681, at *18 (plaintiffs stayed

informed by reading articles relating to the merger and stayed in regular contact with his attorneys). Indeed, although it is not the case here, Texas courts have upheld the appointment of class representatives even where ***most, if not all***, of a plaintiffs' knowledge originated from the attorney. *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 654 (Tex. App.–Houston [14th Dist.] 1995, writ dism'd w.o.j.) (upholding class certification where the class representatives "filed th[e] suit only after learning about their claims from their attorney"); *Adams*, 791 S.W.2d at 291 (the trial court did not abuse its discretion in certifying the class, although the class representatives were admittedly "hand-picked" or selected as representatives).

Of course, Statoil offers no support for the proposition that plaintiffs' counsel should not be providing information to their clients or advising them as to the viability of certain legal claims (because none exists). This is especially true in a complex case such as this, where virtually all of the events supporting the claim took place behind closed doors and were never made public.

In sum, Dr. Schwimmer established his ability to vigorously represent the class, and the trial court's factual findings in this regard are well supported. *Forsyth*, 903 S.W.2d at 150.

### c. Jeffery Whalen

The record is clear that Mr. Whalen is actively involved in and knowledgeable about the litigation. Mr. Whalen sat for deposition and testified live at the class certification hearing after traveling over a thousand miles from California. CR 1717-50.

Mr. Whalen, a retired pharmacist, purchased 1,200 shares of Brigham stock in 2010 and 2011, intending to hold the stock as a long-term investor. CR 1719. He purchased the stock after investigating the Company through the North Dakota Industrial Commission's oil and gas website and after "monitoring [the oil production of] Brigham and some other companies." CR 1718.

Like the other named plaintiffs, Mr. Whalen became upset when he learned of the deal through the news online, particularly the price accepted by the Brigham Board. In his own words, Mr. Whalen explained he "was befuddled that it would be sold and at the share price it was sold for." CR 1719. "When I saw the offer I was upset," Mr. Whalen testified. 3SCR 422. After consulting various internet and news articles concerning the deal, Mr. Whalen contacted attorneys and indicated that he wanted to be part of a lawsuit. CR 1720-21. He also determined that wanted to serve as a class representative. *Id.*

Mr. Whalen explained that he actively monitors his attorneys. He speaks with his attorneys, through emails, conference calls and face-to-face meetings, "on an ongoing basis, I can say twice a week." CR 1725-30; CR 657, 2028. He participates in conference calls with class counsel and the other plaintiffs about the status of the lawsuit, and the retention of experts. *Id.* He has also participated in discovery by gathering documents and helping prepare interrogatory responses to address defendants' discovery requests. CR 657. He has reviewed and verified the pleadings, including the initial petition and the amended petition. *Id.* And – in addition to testifying at a deposition and at the class certification hearing – he would participate in settlement negotiations and would travel to Texas to attend trial. 3SCR 423.

At deposition, Mr. Whalen explained who Ben Brigham, David Brigham, Stephen Reynolds, Hobart Smith and Statoil were, and that each was a named defendant. 3SCR 432-34. In addition, Mr. Whalen had independently reviewed information about Brigham online, such as news, and had visited Brigham's website. 3SCR 431. Mr. Whalen had also reviewed at least seven memoranda from his attorneys. 3SCR 415-16.

It is simply not true, as Statoil contends, that Mr. Whalen does not know he was suing Statoil. *Compare* Statoil AB 12-13 with 3SCR 434 ("Q. Are you suing Statoil, as well? A. Yes."). Although he indicated that some of the

reasons he was suing Statoil were subject to confidential discussions with his attorneys, Mr. Whalen went on to explain at deposition that he was suing Statoil and provided several reasons why. 3SCR 434 ("Q. Other than conversations with your lawyers, do you know why you are suing Statoil and Fargo Acquisition? A. Based upon my review of activity and the assets of the company, and the stock price, that's one reason why I would sue Brigham Exploration and Statoil."); 3SCR 422 (explaining that he was "dissatisfied with the amount" offered by Statoil); 3SCR 434 ("[Brigham] has been undervalued and the stockholders are suffering from that financially.").

In short, Mr. Whalen amply demonstrated the level of involvement with the case that the law requires. *Forsyth*, 903 S.W.2d at 150.

### d. Robert Fioravanti

Mr. Fioravanti, a retired supervisor at Monsanto, is from Massachusetts. CR 1752-53. He also sat for a deposition and testified live at the class certification hearing. CR 1752-1785. Mr. Fioravanti expressed a willingness to appear at trial. 3SCR 220.

Mr. Fioravanti learned of the merger when he received a received a call from his broker notifying him that the Brigham Board had agreed to sell the Company to Statoil. As with the other plaintiffs, he was disappointed at the sale price of $36.50 per share because Brigham stock had hit $40.00 per share

the week prior to the announcement. CR 1755-56. After learning that several lawsuits had been filed against Brigham, he contacted plaintiffs' attorneys, telling them that he "agreed with what they were doing, because [he] believe[d] that Statoil should have paid more money for Brigham Exploration." CR 1757.

Before filing the lawsuit, Mr. Fioravanti conducted online research concerning numerous oil and gas companies, including Brigham. 3SCR 1754-55; *id*. at 1757. He conducted an investigation of Statoil and, through that investigation, discovered that Statoil was producing 40,000 barrels of oil per day. CR 1754-55. In addition, he reviewed articles about the acquisition of Brigham by Statoil (3SCR 192-93); visited the library to read articles about Brigham in financial magazines such as Forbes, Fortune, Smart Money and Kiplinger (*id*.); reviewed the depositions of the other named plaintiffs (3SCR 204); and reviewed the merger agreement, as well as the financial opinion provided by Jefferies and Co. to the Brigham Board when the merger was approved. 3SCR 204, 214.

Mr. Fioravanti stayed apprised of the merger through the financial press and has reviewed everything sent to him by his attorneys. CR 1758, 1760. Since the case was filed, Mr. Fioravanti has had "many" discussions with his attorneys, during which his views had been "accepted and responded to." CR 1761-62. Those discussions included numerous conference calls involving

his attorneys and the other class representatives.  CR 1760-61. In that regard, Mr. Fioravanti testified that he communicated roughly twice per week with attorneys about the lawsuit.  3SCR 193-94.  He has also communicated with other Brigham shareholders.  *Id*.

Like the other plaintiffs, Mr. Fioravanti had reviewed the pleadings and other legal papers filed in this matter.  3SCR 204; CR 672.  In addition to reviewing the pleadings, as discussed above, he has also reviewed the merger agreement (3SCR 214); the fairness opinion offered by Jefferies to the Brigham Board of Directors regarding the value of the Company (3SCR 203-04); numerous memoranda and other documents provided to him by his attorneys (3SCR 191-92); and the interrogatories propounded by defendants to the plaintiffs (CR 1765).  He made clear at the class certification hearing that he reads everything from the litigation that is sent to him.  CR 1760.

Mr. Fioravanti's extensive knowledge of the case extends to Statoil.  He fully understood that he was suing Statoil.  3SCR 205 ("Q. Who are you suing? A. Brigham Exploration.  Q. Who else?  A. Statoil.").  He had specifically performed research on Statoil and understood details about the company such as the number of barrels of oil Statoil was producing per day and the number of rail cars being used to transport oil in the Bakken.  3SCR 192, 201.  He also clearly explained at deposition why he was suing Statoil, because "they didn't

- 81 -

pay a fair value of [Brigham's] worth." 3SCR 205. Indeed, in the same breadth that Statoil says "the named plaintiffs' deposition testimony demonstrated conclusively that they had no knowledge to support an aiding-and-abetting claim," Statoil cites testimony in which Mr. Fioravanti explains why he was suing Statoil. *Compare* Statoil AB12 *with* Statoil AB 14.

In short, Mr. Fioravanti's testimony makes clear that he will fairly and adequately represent the class, as the trial court found. *Forsyth*, 903 S.W.2d at 150.

### e. Raymond Boytim

Mr. Boytim, a resident of Texas, held 23,500 shares of Brigham common stock worth over $850,000 at the time of the tender offer and 19,000 shares at the time the acquisition closed. CR 666; 3SCR 105-06.

As with the other plaintiffs, Mr. Boytim has been informed about the case from day one. Mr. Boytim testified that he has remained informed about the case by reviewing transcripts from the depositions of Brigham's former directors and executives, as well as by doing his own independent investigation after the merger was announced. 3SCR 102-21. As an investor with significant holdings in Brigham, it should come as no surprise that Mr. Boytim also conducted an independent investigation of Brigham before the merger. 3SCR 105-07.

Not surprisingly, at deposition, Mr. Boytim had no problem identifying many of the defendants and their role at Brigham or Statoil. 3SCR 121-22. He knew so much about Brigham that he also conducted and prepared his own valuation analysis of the Company. 3SCR 107.

Because Mr. Boytim understands his fiduciary duties to the class, he has also met with his attorneys on several occasions (3SCR 108); he has been regularly communicating with his attorneys through email and by telephone (3SCR 119); he has fully participated in discovery, including responding to interrogatories and document requests propounded by defendants (3SCR 123) and preparing for and submitted to several hours of deposition testimony. 3SCR 104. Mr. Boytim testified that he had reviewed drafts of the pleadings. 3SCR 128. In his affidavit in support of the motion for class certification, he stated that he has reviewed the significant pleadings, including the petition. CR 964.

He testified that he understands that he is suing Brigham, Statoil and the parties that made the decision to sell the Company. 3SCR 115. Like the other plaintiffs, he was upset at the merger price, which he felt was too low. 3SCR 127. He was upset with the way the deal was consummated, testifying that the Board of Directors had "ramrod[ded]" the merger through. 3SCR 117. He also

provided a detailed explanation of the actions of Statoil which had led him to file suit. 3SCR 117-18.

As is evident from the record, Mr. Boytim is familiar with the claims and will vigorously represent the class. *Forsyth*, 903 S.W.2d at 150.

### f. Myrna Goodman

There is also no abuse of discretion regarding trial court's adequacy findings regarding Myrna Goodman. Throughout the action Ms. Goodman has "actively monitored the litigation and overseen counsel and will continue to do so." CR 664. She has done so through consistent contact with her attorneys, as she testified that she has had approximately 20 conversations, in person and by email. 3SCR 253-54. She has likewise reviewed several memoranda from her attorneys regarding her duties as a class representative. *Id.* at 255.

Ms. Goodman has also reviewed documents from the case, including "key pleadings, such as the Complaint and Preliminary Injunction motion," as well as any documents and deposition testimony from the case. 3SCR 254-55; CR 664. Understanding and appreciating her fiduciary duties to the class, she has participated in discovery and would travel to Austin for trial. 3SCR 260; CR 664.

At deposition, Ms. Goodman testified that she sued Brigham and the remaining principals of Brigham, including Ben Brigham and David Brigham.

3SCR 247. When asked about "the purpose of the lawsuit," she explained that "the shareholders want to get more income [from] the stock" – which is entirely consistent with the objectives of the other named plaintiffs and in the interest of the shareholder class. 3SCR 246.

Like the other named plaintiffs, Ms. Goodman demonstrated her commitment to vigorously represent the class. *Forsyth*, 903 S.W.2d at 150.

### g. Hugh Duncan

Mr. Duncan, a retired attorney, also established that he is familiar with the litigation and has been an active class representative. Mr. Duncan sued because he was "sorely disappointed in the result that was obtained in the merger agreement with Statoil. [He] thought that the agreed upon price was wholly inadequate." CR 517.

Mr. Duncan is yet another plaintiff who was familiar with Brigham prior to the lawsuit. He had conducted an investigation of Brigham in connection with his initial investment. 3SCR 163. After the merger was announced, he remained informed by reviewing articles relating to the merger. 3SCR 159-60, 165. He has also obtained and provided to class counsel information about the expected productivity of Brigham's wells in North Dakota. 3SCR 146. Mr. Duncan testified that Brigham's shareholders were not informed of the negotiations between Ben Brigham and Statoil and the process leading up to the

merger. 3SCR 163-64. He testified that he understood Brigham's accelerated drilling plans. 3SCR 172-73. He testified about his familiarity with the process leading up to the sale of Brigham to Statoil. 3SCR 158-59, 161. Although a class representative is not required to be familiar with legal terms (*see King*, 2004 Tex. App. LEXIS 2623, at *13), Mr. Duncan also explained the duties of loyalty and due care upon which plaintiffs' claims are based. 3SCR 173.

In addition, after the lawsuit was filed, Mr. Duncan received significant pleadings and related materials, including the Complaint, the motion for preliminary injunction, the transcript from the hearing on the motion for preliminary injunction, Court orders and correspondence from counsel regarding Statoil's tender offer, and Brigham's Proxy Statement. CR 675. He has also received numerous documents produced by defendants during the course of this litigation, including presentations to the Brigham Board by its financial advisor before the merger. CR 675-76. He also received the deposition of one of the key witnesses in the case. *Id*.

Mr. Duncan clearly established that he has been actively pursuing the litigation. He testified that he communicated regularly with his attorneys regarding the status of the litigation. 3SCR 108, 119, 171. He testified that he had reviewed defendants' interrogatories and provided all information available to him. 3SCR 176. He testified that he had provided all of the document he

had collected in the process of his evaluation of Brigham. 3SCR 142. Mr. Duncan had also met with his attorneys at least four times. 3SCR 147. And Mr. Duncan, like all of the plaintiffs, sat for several hours of deposition. *Id.* As he explained, "I am trying to keep abreast of my responsibilities as a shareholder and a possible class representative, felt an obligation to keep up with the litigation, you know. And my lawyers have been very good about keeping me informed." 3SCR 146. He testified that he would attend trial. 3SCR 178.

With respect to Statoil, Mr. Duncan testified that he reviewed the merger agreement between Brigham and Statoil, and was familiar with Statoil. 3SCR 142, 145, 165. As the testimony cited by defendant shows, Mr. Duncan fully understood that he was suing Statoil. When asked about this issue at deposition, Mr. Duncan referred to the pleadings and said, "I believe we are . . . ." 3SCR 178.

In short, Mr. Duncan is well suited to represent the class, and he established as much to the trial court. *Forsyth*, 903 S.W.2d at 150.[9]

---

[9] Statoil's citation to *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754 (7th Cir. 2013), highlights its desperate and misguided attempt to show that this case is being controlled by the plaintiffs' attorneys. *Boeing* did ***not*** involve class certification, did ***not*** involve the adequacy of a plaintiff and – in fact – did ***not*** even involve any of the attorneys on this case. Rather, it dealt with the use of certain facts provided by a confidential witness in connection with an amended complaint filed in a §10(b)(5) securities case. *Id.* at 759-60.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that this Court affirm the trial court's class certification order and trial plan.

DATED:  November 20, 2015

Respectfully submitted,

BOULETTE GOLDEN & MARIN L.L.P.
MICHAEL D. MARIN
Texas Bar #00791174


_/s/ Michael D. Marin_
MICHAEL D. MARIN

2801 Via Fortuna Drive, Suite 530
Austin, TX  78746
Telephone:  512/732-8900
512/732-8905 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARK S. REICH
MICHAEL G. CAPECI
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON
DAVID T. WISSBROECKER
STEVEN M. JODLOWSKI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

---

Lead counsel in this case have repeatedly been recognized as the top attorneys in the field of corporate governance litigation and have never been found to be inadequate (despite seeking and obtaining class certification in hundreds of cases during their lengthy careers). In addition, the record *in this case* speaks for itself.

Class Counsel for Plaintiffs-Appellees

KENDALL LAW GROUP, LLP
JOE KENDALL
DANIEL HILL
JAMIE J. McKEY
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: 214/744-3000
214/744-3015 (fax)

THE BRISCOE LAW FIRM, PLLC
WILLIE C. BRISCOE
8150 N. Central Expressway, Suite 1575
Dallas, TX 75206
Telephone: 214/239-4568
281/254-7789 (fax)

DUNNAM & DUNNAM LLP
HAMILTON LINDLEY
4125 West Waco Drive (76710)
P.O. Box 8418
Waco, TX 76714-8418
Telephone: 254/753-6437
254/753-7434 (fax)

BRODSKY & SMITH, LLC
EVAN J. SMITH
MARC ACKERMAN
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
Telephone: 610/667-6200
610/667-9029 (fax)

LEVI & KORSINSKY, LLP
SHANE T. ROWLEY
30 Broad Street, 24th Floor
New York, NY 10004
Telephone: 212/363-7500
866/367-6510 (fax)

KOHN, SWIFT & GRAF, P.C.
DENIS F. SHEILS
One South Broad Street, Suite 2100
Philadelphia, PA 19107-3389
Telephone: 215/238-1700
215/238-1968 (fax)

THE WEISER LAW FIRM, P.C.
PATRICIA C. WEISER
JAMES M. FICARO
22 Cassatt Avenue
Berwyn, PA  19312
Telephone:  610/225-2677
610/408-8062 (fax)

RYAN & MANISKAS, LLP
KATHARINE M. RYAN
RICHARD A. MANISKAS
995 Old Eagle School Road, Suite 311
Wayne, PA  19087
Telephone:  484/588-5516
484/450-2582 (fax)

KELLY N. REDDELL
THE REDDELL FIRM PLLC
100 Highland Park Village, Suite 200
Dallas, Texas 75205
Telephone:  214/295-3031

Additional Counsel for Plaintiffs-
Appellees

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing document contains 17,753 words, excluding the portions excluded by Texas Rule of Appellate Procedure 9.4(i)(1). It was prepared in Microsoft Word using 14-point typeface for body text and 12-point typeface for footnotes. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

/s/ Michael D. Marin
MICHAEL D. MARIN

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document will be electronically filed using a certified Electronic Filing Service Provider, which will send electronic notification of such filing to the following counsel of record on the 20th day of November, 2015, or alternatively, a copy will be sent via U.S. Mail, to the parties listed in the attached service list.

/s/ Michael D. Marin
MICHAEL D. MARIN

**COUNSEL FOR DEFENDANT(S)**

Timothy R. McCormick
Michael W. Stockham
Timothy E. Hudson
Thompson & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX  75201-2533
  Telephone:  214/969-1700
  214/969-1751 (fax)
  Email: timothy.mccormick@tklaw.com;
        michael.stockham@tklaw.com;
        tim.hudson@tklaw.com

Russell S. Post
Alexander Fields
Parth Gejji
Christopher R. Cowan
Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
    Telephone: 713/951-3700
    713/951-3720
    Email:  rpost@beckredden.com
          falexander@beckredden.com
          pgejji@beckredden.com
          ccowan@beckredden.com

Debora B. Alsup
Thompson & Knight LLP
98 San Jacinto Blvd., Suite 1900
Austin, TX  78701
  Telephone:  512/469-6100
  512/469-6180 (fax)
  Email: debora.alsup@tklaw.com;
        danley.cornyn@tklaw.com

**COUNSEL FOR PLAINTIFF(S)**

Michael D. Marin
Boulette Golden & Marin LLP
2801 Via Fortuna Drive, Suite 530
Austin, TX 78746
    Telephone:  512/732-8900
    512/732-8905 (fax)
    Email:   mmarin@boulettegolden.com

Shane T. Rowley
Levi & Korsinsky, LLP
30 Broad Street, 24th Floor
New York, NY  10004
    Telephone:  212/363-7500
    866/367-6510 (fax)
    Email:  srowley@zlk.com

Joe Kendall
Daniel Hill
Jamie J. McKey
Kendall Law Group, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
    Telephone:  214/744-3000
    214/744-3015 (fax)
    Email:  jkendall@kendalllawgroup.com;
            dhill@kendalllawgroup.com;
            jmckey@kendalllawgroup.com

Evan J. Smith
Marc L. Ackerman
Brodsky & Smith, LLC
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
    Telephone:  610/667-6200
    610/667-9029 (fax)
    Email:  esmith@brodsky-smith.com;
            mackerman@brodsky-
            smith.com

Hamilton Lindley
Dunnam & Dunnam LLP
4125 West Waco Drive (76710)
P.O. Box 8418
Waco, TX  76714-8418
    Telephone:  254/753-6437
    254/753-7434 (fax)
    Email: hlindley@dunnamlaw.com

Denis F. Sheils
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107-3389
    Telephone:  215/238-1700
    215/238-1968 (fax)
    Email:  dsheils@kohnswift.com

Samuel H. Rudman
Mark S. Reich
Michael G. Capeci
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
   Telephone:  631/367-7100
   631/367-1173 (fax)
   Email:  srudman@rgrdlaw.com;
       mreich@rgrdlaw.com;
       mcapeci@rgrdlaw.com

Randall J. Baron
David T. Wissbroecker
Steven M. Jodlowski
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
   Telephone:  619/231-1058
   619/231-7423 (fax)
   Email:  rbaron@rgrdlaw.com;
       dwissbroecker@rgrdlaw.com;
       sjodlowski@rgrdlaw.com

Patricia C. Weiser
James M. Ficaro
The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA 19312
   Telephone:  610/225-2677
   610/408-8062 (fax)
   Email:  pw@weiserlawfirm.com;
       jmf@weiserlawfirm.com

Katharine M. Ryan
Richard A. Maniskas
Ryan & Maniskas, LLP
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
   Telephone:  484/588-5516
   484/450-2582 (fax)
   Email:  kryan@rmclasslaw.com;
       rmaniskas@rmclasslaw.com

Kelly N. Reddell
The Reddell Firm PLLC
100 Highland Park Village, Suite 200
Dallas, Texas 75205
   Telephone:  214/295-3031
   Email:  kelly@reddell-law.com

Willie C. Briscoe
The Briscoe Law Firm
8150 N. Central Expressway, Suite 1575
Dallas, TX 75206
   214/239-4568
   281/254-7789(Fax)
   Email:wbriscoe@thebriscoelawfirm.com

**No. 03-15-000248-CV**

IN THE THIRD COURT OF APPEALS
THIRD JUDICIAL DISTRICT OF TEXAS
AUSTIN, TEXAS

BRIGHAM EXPLORATION COMPANY, BEN M. BRIGHAM,
DAVID T. BRIGHAM, HAROLD D. CARTER, STEPHEN C. HURLEY,
STEPHEN P. REYNOLDS, HOBART A. SMITH, SCOTT W. TINKER,
STATOIL ASA, AND FARGO ACQUISITION, INC.,

*Appellants*,

vs.

RAYMOND BOYTIM, ET AL., INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,,

*Appellees*.

Appeal from the 261st Judicial District Court of Travis County, Texas
Trial Court No. D-1-GN-11-003205
The Honorable Lora Livingston, Presiding

## APPENDIX

| A | *Havens v. Pate*, No. 2002-16085, Defendants' Fourth Amended Original Answer (Harris Cnty. Dist. Ct. Aug. 19, 2005) | Hand-filed on 03/19/15 by district clerk without Bates numbering |
|---|---|---|

# APPENDIX A

CAUSE NO. 2002-16085

| | | |
|---|---|---|
| JOHN F. HAVENS and PETER ELLOWAY, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, | § § § § § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | HARRIS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| DONNA C. PATE in her capacity as Independent Executor of the Estate of James L. Pate, TERRY L. SAVAGE, H. JOHN GREENIAUS, BRENT SCOWCROFT, LORNE R. WAXLAX, FORREST R. HASELTON, C. BERDON LAWRENCE, JAMES J. POSTL and GERALD B. SMITH, | § § § § § § § § | 295TH JUDICIAL DISTRICT |
| | | |
| Defendants. | | |
| | § | IN THE DISTRICT COURT OF |
| [consolidated with] | § | |
| | § | |
| HOWARD LASKER, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, | § § § § | |
| | § | HARRIS COUNTY, TEXAS |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| DONNA C. PATE in her capacity as Independent Executor of the Estate of James L. Pate, TERRY L. SAVAGE, H. JOHN GREENIAUS, BRENT SCOWCROFT, LORNE R. WAXLAX, FORREST R. HASELTON, C. BERDON LAWRENCE, JAMES J. POSTL and GERALD B. SMITH, | § § § § § § § § | 295TH JUDICIAL DISTRICT |
| | | |
| Defendants. | | |

## DEFENDANTS' FOURTH AMENDED ORIGINAL ANSWER

HOU02:1039583.1

Donna C. Pate in her capacity as Independent Executor of the Estate of James L. Pate, Terry L. Savage, H. John Greeniaus, Brent Scowcroft, Lorne R. Waxlax, Forrest R. Haselton, C. Berdon Lawrence, James J. Postl and Gerald B. Smith, (collectively "Defendants") answer Plaintiffs' Fourth Amended (Consolidated) Petition as follows:

## I.  General Denial

Pursuant to Texas Rule of Civil Procedure 92, Defendants generally deny the material allegations, charges and claims contained in Plaintiffs' Fourth Amended (Consolidated) Petition. Plaintiffs therefore must prove these allegations to the jury by the greater weight of the believable evidence, as required by the Constitution and laws of this State.

## II.  Special Exceptions

1.  Defendants specially except to Plaintiffs' Fourth Amended (Consolidated) Petition in its entirety because Plaintiffs failed to make a pre-suit demand on the Pennzoil board of directors as required by Delaware law.

2.  Defendants further specially except and object to Plaintiffs' Fourth Amended (Consolidated) Petition in its entirety because a party seeking to maintain a shareholder derivative action must allege with particularity either (1) that he has made a demand upon the corporation's board of directors to bring the lawsuit, or (2) that such a demand would be futile and is excused. Plaintiffs failed to make such a demand upon Pennzoil's board of directors and do not and cannot allege with any particularity that the demand would have been futile.

3.  Defendants specially except to Paragraphs 74 and 75 of Plaintiffs' Fourth Amended (Consolidated) Petition, in which Plaintiffs assert a claim for aiding and abetting breach of fiduciary duty, because those paragraphs fail to give adequate notice of the Defendants against whom the aiding and abetting claim is asserted. Plaintiffs should be required to identify

which Defendants allegedly breached fiduciary duties and which Defendants did not breach fiduciary duties but rather allegedly aided and abetted other Defendants in doing so.

4. Defendants specially except to Plaintiffs' Fourth Amended (Consolidated) Petition in its entirety because it fails to state the maximum amount of damages Plaintiffs seek.

## III. Affirmative Defenses

5. Plaintiffs lack standing and therefore are not entitled to recover for themselves or derivatively for Pennzoil in the capacity in which they sue.

6. Plaintiffs failed to make demand on Pennzoil and therefore are not entitled to recover in the capacity in which they sue.

7. Plaintiffs' claims for monetary damages for Defendants' alleged breaches of the duty of care and to disclose are barred by the Limitation of Liability provision in Article IX of Pennzoil's certificate of incorporation.

8. Plaintiffs' claims for monetary damages for Defendants' alleged breaches of the duty of care were extinguished by the fully informed shareholder vote approving and ratifying the merger.

## IV. Attorneys' Fees and Costs

9. Pursuant to Article 5.14 (J) of the Texas Business Corporation Act, Defendants seek to recover from Plaintiffs all expenses, including attorneys' fees and costs, incurred by Defendants and Pennzoil-Quaker State Company in investigating and defending this proceeding.

## V. Further Amendment

10. Defendants reserve the right to amend this answer in accordance with the Texas Rules of Civil Procedure or any order of the Court.

WHEREFORE, PREMISES CONSIDERED, Defendants pray that the Court deny all of Plaintiffs' requests for relief; enter judgment that Plaintiffs take nothing; order Plaintiffs to pay expenses as provided by Article 5.14 (J) of the Texas Business Corporation Act; and grant Defendants all the other relief to which they may be justly entitled.

Respectfully submitted,

BAKER BOTTS L.L.P.

James Edward Maloney
State Bar No. 12881500
Paul R. Elliott
State Bar No. 06547500
Michael C. Massengale
State Bar No. 24003704
Rebeca Aizpuru Huddle
State Bar No. 24012197
One Shell Plaza
910 Louisiana
Houston, Texas 77002
713.229.1234 Telephone
713.229.1522 Telecopier

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on this 8ᵗʰ day of August, 2005, I delivered a true and correct copy of the foregoing by to plaintiffs' counsel of record.

_____
Rebeca Aizpuru Huddle

## VERIFICATION

STATE OF TEXAS                    §
                                  §
COUNTY OF HARRIS                  §

Before me, the undersigned notary, on this day, personally appeared James Edward Maloney, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said he read Paragraphs 5-8 of Defendants' Fourth Amended Original Answer and that the facts stated in those paragraphs are within his personal knowledge and true and correct.

_____
James Edward Maloney

Sworn to and subscribed before me by James Edward Maloney on August _19_, 2005.

_____
Notary Public in and for the
State of Texas

KATHERINE WINDISCH
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
OCT. 25, 2005

My commission expires: _____.